C. Boyd CORSA, Fish Products Company of New Jersey, A New Jersey Corporation, Atlantic Navigation Company, A New Jersey Corporation, Seacoast Products, Inc., A Delaware Corporation, and Fish Products Company, A Delaware Corp., et al., Plaintiffs,

v.

John P. TAWES, Fred P. Glose and John R. Jewell, constituting the Commission of Tidewater Fisheries of Maryland, and Daniel T. Prettyman, State's Attorney for Worcester County, Maryland, Defendants.

Civ. A. No. 9077.

United States District Court
D. Maryland.

March 27, 1957.

William H. Price, Staton, Whaley & Price, Snow Hill, Md., for plaintiffs.

Ambler H. Moss, Baltimore, Md., Ammon G. Dunton, C. Jackson Simmons, Whitestone, Va., Semmes, Bowen & Semmes, Baltimore, Md., for intervenors.

C. Ferdinand Sybert, Elliott City, Md., Edward S. Digges, La Plata, Md., Alexander Harvey, II, Baltimore, Md., for defendants.

Before SOBELOFF, Circuit Judge, and CHESNUT and THOMSEN, District Judges.

SOBELOFF, *Circuit Judge.*

By this suit an individual Delaware plaintiff and corporate plaintiffs of New Jersey and Delaware challenge the constitutionality of certain provisions of Maryland's fishing laws. Two sections of the law are under attack: one, Section 259 of Article 66C of the Annotated Code of Maryland 1951, prohibits the use of purse nets in any of the tidal waters of the State; the other, Section 258, excludes non-residents from fishing privileges in Maryland's tidal waters. Pursuant to Title 28 U.S.C.A. §§ 2281, 2284, this three-judge Court was convened.

The plaintiffs are engaged in various aspects of the menhaden fishing industry—some are menhaden fishing boat owners, others are lessees of such boats and operate processing plants out of the State. The individual plaintiff, Corsa, is a menhaden boat captain. The menhaden is a migratory fin fish which travels in large schools and is found during the summer months off the coast of Maryland and neighboring states, both within and beyond the three-mile belt, and to some extent in the Chesapeake Bay. They are commercially valuable as a source of fish oil and meal and other useful by-products, and plaintiffs' plants, after processing the fish, ship substantial quantities of these products in interstate commerce.

The established practice of the industry is to catch the fish by means of a purse net, for they cannot be caught economically in commercial quantities in any other way. When a school is sighted, the mother boat sends out two smaller seine boats with the purse net. This device, which is often a quarter of a mile in length and eighty feet deep, is designed to capture entire schools of menhaden in one quick operation. Rings on the lower edge of the net rest upon the ocean floor, and the net reaches to within one or two feet above sea bottom. When the school is encircled, the seine boats draw the ends of the net together, closing the purse and entrapping the fish within. Plaintiffs' operations, so far as Maryland territorial waters are concerned, are limited to the ocean strip; they do not fish in the Maryland portion of the Chesapeake Bay or its tributaries.

On June 26, 1956 Corsa's vessel, by use of a purse net, caught a load of menhaden in the Atlantic Ocean within three miles of the Maryland coast. He was thereupon served with a summons by an agent of the defendant Commission of Tidewater Fisheries of Maryland, charging him with violating Article 66C, Section 259, Annotated Code of Maryland 1951, the pertinent provisions of which are not limited to menhaden but prohibit the catching of any fin fish in Maryland tidal waters by use of a purse net. Criminal proceedings thereafter were instituted against Corsa in the Circuit Court for Worcester County.

This suit was brought by the plaintiffs to enjoin the enforcement of Section 259 on the grounds that it violates the due process clause of the 14th Amendment and unduly burdens interstate commerce in contravention of Article I, Section 8 of the United States Constitution. Others similarly engaged in the menhaden industry and faced with prosecution under Section 259 have joined as intervening plaintiffs. The criminal prosecution against Corsa has been continued by the Circuit Court of Worcester County awaiting the outcome of this case. Pending the proceeding in this Court further enforcement of the statute against the plaintiffs has, with the consent of the State, been temporarily restrained by us.

Since the decision in Manchester v. Commonwealth of Massachusetts, 1890, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159, it has been beyond dispute that in the absence of conflicting Congressional legislation under the commerce clause, regulation of the coastal fisheries is within the police power of the individual states under the doctrine of Cooley v. Board of Wardens of Port of Philadelphia, 12 How. 299, 53 U.S. 299, 13 L.Ed. 996; Manchester v. Commonwealth of Massachusetts, supra, 139 U.S. at page 266, 11 S.Ct. at page 565; Skiriotes v. State of Florida, 313 U.S. 69, 75, 61 S.Ct. 924, 85 L.Ed. 1193; Toomer v. Witsell, 334 U.S. 385, 393, 68 S.Ct. 1156, 92 L.Ed. 1460. Congress has not sought to impose uniformity, but has been content to leave the matter to local authority and has recently made this intention explicit in the Submerged Lands Act of 1953, Title 43 U.S.C.A. §§ 1301(e) and 1311 (a).

While in the exercise of this power the State is not immune from recognized constitutional limitations, it is to be remembered that in the field of conservation, as in others, courts will not strike down legislative enactments as violative of due process unless the means chosen bear no reasonable relation to the objective sought to be accomplished. Lacoste v. Department of Conservation, 263 U.S. 545, 552, 44 S.Ct. 186, 68 L.Ed. 437; Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 427–428, 56 S.Ct. 513, 80 L.Ed. 772. Upon such concepts, prohibitions against the use and possession of purse nets and other particular kinds of fishing devices have been upheld. See Miller v. McLaughlin, 281 U.S. 261, 50 S.Ct. 296, 74 L.Ed. 840.

The objection to purse nets is said to be their excessive efficiency. In seeking to prove that the legislation in question bears no reasonable relation to conservation, it has been argued before us that restrictions upon the catching of

some species of fish, including menhaden, have no effect upon conserving the supply. It is said that natural factors, beyond the control of man, such as weather, currents, and salinity, predominantly determine the abundance of fish, and it is the plaintiffs' insistence that the amount of menhaden withdrawn by fishing, regardless of the means employed, is infinitesimal in relation to the present menhaden population. Though there doubtless are differences of opinion among experts as to this and as to the need for and effectiveness of specific conservation measures, we cannot close our eyes to the manifold illustrations of experience, where man's over-exploitation has sharply diminished or even extinguished the supply of natural resources, wild game, and fish. As was said by the Supreme Court in Bayside Fish Flour Co. v. Gentry, supra, 297 U.S. at page 428, 56 S.Ct. at page 515, regarding such legislative enactments, " * * * we cannot invalidate them because we might think, as appellant in effect urges, that they will fail or have failed of their purpose." Moreover, plaintiffs' witnesses who expressed the opinion that such conservation measures in the case of menhaden are unavailing to achieve protection of the supply, admitted that man's activities are the only factor which may be controlled. While insisting that depletion of the supply of menhaden was a possibility too remote to merit serious consideration, they conceded that no resource is inexhaustible and that a point may be reached, due to man's fishing pressure or to natural causes, where further exploitation could bring serious results.

██ We think, however, that the protective hand of the State may be extended before the danger is unmistakably imminent. Conditions may go unnoticed so long that when the threat is demonstrated it is too late to avert the harm. One witness for the plaintiffs testified that no matter how much a supply may be reduced by over-fishing, provided that the stock is not completely annihilated, it may in time replenish itself. We need not quarrel with this statement of scientific opinion, but in the practical management of its resources, the State may conclude that the time for action is long before the destruction has gone that far. The State is interested not merely in the preservation of specimens for museums but in conserving and perpetuating a constant supply.

██ That a natural resource is subject to injury by causes beyond man's control is not a sufficient reason for us to require the State to refrain from such measures as may reasonably be taken to prevent unnecessary depredations by man. A similar aspect of human experience is in the field of medicine. While it is realized that human health and the life span are largely governed by factors beyond man's control, this realization is not deemed sufficient reason for excluding such efforts as the medical profession can make to protect man against disease and death.

██ If there is any fact so firmly fixed in the public consciousness as to justify judicial notice of it by judges residing in Maryland it is that the formulation and reformulation of policy, and the administration and enforcement of the State's fishing laws have been matters of perennial and spirited discussion and not infrequent legislation in the General Assembly.[1] Again and again elaborate

1. The regulation of purse netting has had a long history in Maryland. Some of the enactments to be found are: Ch. 740, p. 145, Acts of 1908 which contained a preamble reciting that purse nets tended to decrease the stock of food fish, and added Sections 2A and 2B to Article 39, 1904 Code; Ch. 828, Acts of 1914, amending Section 2B; Ch. 14, 1917, Extraordinary Session, codified as Article 39, Section 4, 1924 Code; Ch. 471, Acts of 1929, Sections 26, 27, 28; Ch. 175, Acts of 1931, codified as Article 39, Section 30, 1939 Code; Ch. 709, Acts of 1941, repealing Section 30 of Article 39, 1939 Code, and revising Section 28; Section 28 of Article 39, 1939 Code, substantially the same as the present Section 259, except for minor revisions made by Ch. 191, Acts of 1943, and Ch. 867, Acts of 1947.

studies have been made by public officers and commissions. Their recommendations have been debated by the commercial interests concerned, by sports fishermen, in the press and in the legislative chambers. The need for and the effectiveness of various measures regulating the practices, places, and instrumentalities of fishing, have been argued at length at almost every legislative session.

Opinion as to many of these matters is sharply divided, both as to whether particular regulatory provisions have the desired result upon fish population, and also as to the social policy that the State should follow in the management of its resources. It is a difficult problem or complex of problems, and the issues cannot be resolved for all time by any single enactment. Questions as to the adequacy of existing laws bring serious conflict, and no one is in a position to demonstrate absolutely at what point certain protective measures are no longer required. Wide fluctuation in the abundance of various species is not unknown and is a fact acknowledged by the plaintiffs' witnesses. Men disagree as to what is a reasonable and benign utilization of natural resources, and what is destructive exploitation.

■ Where should these conflicts be resolved? Certainly the courts are not the appropriate forum. These matters are peculiarly legislative in character, and not within the judicial sphere.

It was suggested that menhaden are not fit for human consumption and are not a chief source of food for edible species. Upon this foundation it is argued that menhaden are not a fit subject for conservation, and that to avoid violation of due process, we should carve out of the statutory prohibition against purse netting an exception for this particular fish. In addition to what we have already said there are further considerations which require us to deny this contention.

Considering that fishing has been a principal occupation of man for countless centuries it is astonishing how little precise information we have as to the habits, migrations, propagation, and proper methods of conserving the supply of fish generally. In this nebulous field the menhaden is no exception; indeed it may take rank among those about which least is known. In recent years, marine biologists have been conducting experiments to enlarge the sphere of knowledge. Some of these experiments were testified to by plaintiffs' witnesses, particularly with regard to the extent to which menhaden constitute a food supply for other fish. While these studies indicate that menhaden are not the principal food supply for food fish in Maryland waters, they are a source of some consequence.

A witness for plaintiff supported his testimony by reliance upon an examination of the contents of the stomachs of 750 blue fish caught in Maryland waters. Menhaden were found in 11 per cent of them, and many of the other 89 per cent contained no food. Reasoning from this slender basis he inferred that menhaden constitute but 11 per cent of the food supply of blue fish. Eleven per cent strikes us as non inconsiderable, but the inference itself seems dubious. It is about as logical to draw from this meager data the broad conclusion that 11 per cent is the limit of the menhaden role in the blue fish diet, as it would be to interpret the experiment as establishing that considerable numbers of blue fish live without food.

■■ Moreover, were the supply of menhaden diminished it might mean that the fish which feed in part upon menhaden would look to other sources, perhaps other food fish, as the witness Hollis supposed. Nor has it been ruled out that other non-edible fish which live in whole or in part on menhaden are themselves eaten by food fish. These assuredly are factors that may be considered. Neither the duration nor the scope of the scientific studies to which we have been directed is such that this court could find in them demonstration beyond further debate that, as applied to menhaden, the regulation here challenged has no

reasonable relation to the ends sought to be achieved. The matter was at the time of its enactment and still is one fairly within the province of legislative judgment. We cannot say that the observation made in Manchester v. Commonwealth of Massachusetts, supra, 139 U. S. at page 265, 11 S.Ct. at page 565, that menhaden are food for other fish has been clearly proved to be erroneous. If there is new light that is claimed to cast doubt on these legislative assumptions, it should be called to the attention of the legislature. If the legislature deems it appropriate to carve out exceptions it may do so.[2] It is not a judicial function to write amendments into the law to accord with the court's ideas of wisdom and appropriateness.

The difficulty of enforcement is also a salient feature entitled to weight. It was given point by the plaintiff Corsa while on the stand. Testifying that he was aware of the Maryland prohibition against purse nets within the three-mile belt, he stated with astonishing candor that he habitually fished for menhaden within this area whenever he thought he would not be apprehended. The difficulty of enforcement would be compounded if purse netting for menhaden were permitted within the three-mile coastal area. It is obvious that it would be more burdensome to police against purse netting for food fish if purse netters were permitted to enter the area in pursuit of menhaden; an enforcement official so testified.

■■■ Decision as to whether the State's interest requires a prohibition of all purse netting in this area in order to protect sports fishing, which itself supports a considerable industry in this State, is also a legislative prerogative. It is a legitimate objective for the State to sponsor sports fishing and the economic interests dependent upon it. Ocean City, the principal seacoast vacation resort of Maryland, is along this coast and numerous sport fishing boats sail from

it. While there was testimony of isolated instances where menhaden fishermen operated side by side with game fishermen, the testimony also showed, and it is a matter of common knowledge, that sports fishermen seriously object to purse netting as interfering with their pursuits. The Chairman of the defendant Tidewater Fisheries Commission, Mr. John P. Tawes, testified that his office receives many such complaints from the sports fishermen.

Other witnesses testified that New York and New Jersey regulate purse netting within particular areas for the protection of the sports fishery. New York, they said, restricts purse netting in the vicinity of Coney Island, and New Jersey does not allow the practice within two miles of shore in certain areas. If Maryland deems it necessary or desirable to apply the restriction for the entire three-mile width of its short coastal jurisdiction, it may do so.

For these reasons we do not think that the Maryland statute, Section 259, as applied to fishing for menhaden, deprives the plaintiffs of their liberty or property without due process of law.

■■■ We now turn to the second objection raised by the plaintiffs, namely, that the purse-netting prohibition effects an undue burden upon interstate commerce. This, likewise, we find without merit.

■■■ Doubtless catching menhaden and processing them into useful products is a legitimate occupation and is commerce the interstate aspects of which cannot be interfered with arbitrarily. But the same Constitution which puts interstate commerce under the protection of Congress, recognizes the sovereignty of the states in local regulation for the protection of their natural resources. If the adverse effect on interstate commerce is only incidental and indirect and is outweighed by the local benefits which the statute is designed to achieve, the commerce clause will not

2. Indeed, a bill is now pending in the legislature which would create an exception for menhaden. Senate Bill 528, 1957 Session.

render the enactment invalid. Southern Pacific Co. v. State of Arizona, 325 U.S. 761, 770–771, 65 S.Ct. 1515, 89 L.Ed. 1915. The local benefits to which we have previously referred clearly indicate a rational basis for the legislation here questioned, and that the interference with interstate commerce is merely incidental. There is nothing to prevent menhaden fishermen from seeking their catch beyond the three-mile belt, for the evidence shows that during the menhaden season the fish are present in plentiful numbers as far as seventy-five miles off coast, and it is the practice to fish up to at least eight miles out.

 The plaintiff Corsa testified on direct examination that excluding him from the Maryland three-mile coastal belt would affect his catch 20 per cent. On cross-examination, however, he clarified his statement, saying that he merely meant that he caught 20 per cent of his catch opposite the Maryland shore both within and beyond the three-mile belt. Regardless of the actual per cent of loss caused, we may, in any event, assume that it would be more convenient, and financially advantageous for him and others engaged in the same business to fish close to shore. But we cannot say that the commerce clause requires the State to yield to mere convenience and advantage to particular industries, when it may reasonably consider conservation of paramount importance. Such questions are primarily of a local nature. In Toomer v. Witsell, supra, 334 U.S. at pages 394–395, 68 S.Ct. at page 1161, which dealt with a poundage tax upon

fish levied by South Carolina, the Court held that the tax was not a burden on interstate commerce because the taking of the fish occurred before interstate commerce began.

The legislative policy of Congress manifested in the Black Bass Act[3] recently expanded to include other fish[4] is pertinent to the inquiry here, if not controlling. That statute makes it unlawful for anyone to transport fish out of a state where such transportation is prohibited by state law or where the taking of fish is, in the first instance, prohibited by state law. It can be inferred that this statute broadly recognizes the right of the states to burden interstate commerce in fish by forbidding their transportation or by interposing restrictions earlier in the chain of events by prohibiting fishing altogether. It may at least be said that whatever burden Section 259 imposes upon interstate commerce by prohibiting purse netting has been condoned by the Congress.

We conclude, therefore, that Section 259 is not repugnant either to the due process clause of the 14th Amendment or to the commerce clause of the Constitution. The relief prayed, must therefore be denied.

 The plaintiffs' challenge is aimed also at Section 258 of Article 66C, on the ground that it discriminates against non-residents in violation of the privileges and immunities clause of the 14th Amendment or, perhaps more accurately, Article IV, Section 2 of the Constitution of the United States. Inasmuch as the State has not attempted to enforce Sec-

3. C. 346, 44 Stat. 576, c. 801, 46 Stat. 845, 16 U.S.C.A. § 852.

4. C. 348, 61 Stat. 517, amended c. 911, 66 Stat. 736, 16 U.S.C.A. § 852. *"Transportation forbidden where law has been violated.* It shall be unlawful for any person to deliver or knowingly receive for transportation, or knowingly to transport, by any means whatsoever, from any State, Territory, or the District of Columbia, to or through any other State, Territory, or the District of Columbia, or to or through any foreign country, any black bass or other fish, if (1) such

transportation is contrary to the law of the State, Territory, or the District of Columbia from which such black bass or other fish is or is to be transported, or is contrary to other applicable law, or (2) such black bass or other fish has been either caught, killed, taken, sold, purchased, possessed, or transported, at any time contrary to the law of the State, Territory, or the District of Columbia in which it was caught, killed, taken, sold, purchased, or possessed, or from which it was transported or contrary to other applicable law; * * *."

tion 258 against the plaintiffs and has indicated its intention not to do so, and the plaintiffs did not further press for an adjudication of their rights under Section 258, we do not decide the constitutional question raised as to this section in the bill of complaint. Even though serious constitutional doubts may be raised, see Toomer v. Witsell, supra, a court will not adjudicate constitutional issues unless necessary to dispose of the instant case.

Accordingly, the bill of complaint will be dismissed with costs.