Paul **GLENOVICH** and Johnnie D. Dontos, Plaintiffs,

v.

Wallace H. **NOERENBERG,** Commissioner of Fish and Game, State of Alaska, and Emery W. Chapple, Jr., Commissioner of Public Safety, State of Alaska, Defendants.

Civ. A. No. J–2–71.

United States District Court,
D. Alaska.

July 18, 1972.

Byron D. Coney, Seattle, Wash., Dodd, Hamlin & Coney, Seattle, Wash., Gordon E. Evans, Juneau, Alaska, Davidson, Engstrom & Evans, Juneau, Alaska, on brief; Robert L. Bergstrom, Juneau, Alaska, of counsel, for plaintiffs.

M. Gregory Papas, Asst. Atty. Gen., State of Alaska, Juneau, Alaska, for defendants.

Before KILKENNY, Circuit Judge, and EAST and von der HEYDT, District Judges.*

## DECISION

EAST, Senior District Judge:

This cause was submitted upon Federal Constitutional issues delineated in the pretrial order and the facts as set forth in the admitted facts, affidavits and depositions of witnesses for the parties on file herein following oral presentation of counsel for the parties.

## JURISDICTION

This three-judge district court notes its jurisdiction under Title 28 U.S.C.A. Sections 1331, 1343(3) and 2281, 2283 and 2284 and Title 42 U.S.C.A. Section 1983.

## FACTUAL SITUATION

It appears from the factual record herein and the Court finds that:

Parties:

The plaintiff, Paul Glenovich (Glenovich) and Johnnie D. Dontos (Dontos), each, have been for some years past and are now citizens of the State of Washington, and each owns and operates a documented fishing vessel commonly known as a "purse seiner" and has for some ten years and is now duly licensed to fish commercially for salmon in the State of Alaska waters.

The defendant, Wallace H. Noerenberg, is the Commissioner of the De-

---

* Honorable John F. Kilkenny, Senior United States Circuit Judge for the Ninth Circuit, William G. East, Senior United States District Judge for the District of Oregon and James A. von der Heydt, United States District Judge for the District of Alaska, constituting a statutory three-judge district court by designation of Chief Judge Richard H. Chambers for the Ninth Circuit, dated May 13, 1971.

partment of Fish and Game of the State of Alaska (Department). The Department was established by Alaska's legislature during 1959 and is charged through the delegation to "manage, protect, maintain, improve and extend the fish and game resources of the State in the interest of the economy and general well-being of the State," all pursuant to the fishery laws and statutes of the State and specifically AS Section 16.10.120 under attack herein.

Defendant Emery W. Chapple, Jr., is the Commissioner of Public Safety of the State of Alaska and pursuant to Administrative Order No. 16, dated March 28, 1972, is responsible for the administration and enforcement of certain statutes and particularly the mentioned Section and the Department's regulations supplementing it and has been added as party defendant by agreement of counsel.

Importance of Alaska Salmon Resource:

For over 90 years commercial fishing has been a prime factor in the economic development of Alaska. In 1970 22,000 fishermen earned nearly $100 million in catching a product worth $214 million at first wholesale value.

The five identified species of eastern Pacific salmon occurring in Alaska's waters comprise a self-renewing resource through the natural phenomena of returning from the sea as adults to ascend the rivers of their heritage to breed and restock the fisheries. Generally speaking, the reoccurring abundance of salmon depends upon and is the function of the number of fish returning to and reaching the spawning grounds (termed escapement) thereby completing the natural cycle of replacement.

During the years 1940 through 1960 the salmon population of Alaska's waters was threatened with extinction through over harvest of the returning salmon by fishermen.

Among the objectives of the Department as managers of the fisheries is the promulgation and execution of measures to achieve maximum sustained yield of salmon stocks. The desired effect of fishing is to remove the surplus portion of the runs, those likely to reproduce least effectively or those which normally would be forced to spawn in poor or marginal areas through overcrowding. In the final analysis a commercial fishery may be looked upon essentially as the utilization of that part of a highly productive natural resource which is in excess of that required to maintain the resource. Thus, overfishing may be considered to be the level of harvest which exceeds the surplus and depletes the brood stock.

Given the dependence upon escapement for levels of abundance in succeeding years, the concern is to perpetuate a brood stock sufficiently large to utilize fully the available spawning or nursery habitat, i.e., to achieve optimum escapement. For only in this way can there continue to exist a significant commercial harvest from year to year. This requires a flexible management scheme wherein the intensity of fishing effort can be controlled commensurate with the level of abundance of the resource.

The time honored brakes upon fishermen, namely: 1) time and area restrictions upon fishing, 2) restrictions aimed at standardization of gear and use thereof, prohibitions of types of gear and use thereof, and 3) catch or take restrictions have been the working tools of the legislature and the Department for management of the fisheries. Some of these tools are for use in static situations and some are used to meet emergencies. Time and area restrictions sometimes must be as mobile as the runs of fish at sea, and sometimes as permanent as natural fish holding areas and approaches to proven spawning grounds. The regulations for standardization of gear and use thereof and the prohibition of gear types and use thereof are static necessities in reaching an intelligent forecast and decision to utilized time and area restrictions and to outlaw known dangers to good fishing.

Area of Purse-Seiner Operation:

A method of fishing, common in the industry, is known as "purse-seining", the basic principle of which involves describing a wide arc through the fished waters with a long net, one end of which is carried out from the fishing boat in a small skiff, after which the arc is closed into a circle, the bottom of the net pulled together or "pursed" while the top of the net or "corkline" floats on the surface, and one end of the net is then hauled on board the boat until the captured fish can be retrieved, at which time the operation is repeated.

The Alaska waters purse-seiner operates mainly along the coast of southeastern Alaska. Salmon production in that fishery began a sharp decline in the 1940s that terminated in 1960 with one of the lowest catches since the inception of the fishery in the late 1880s. Although the average catch since 1960 has increased it does not equal 50% of the annual average of 39 million salmon taken between 1920 and 1949.

Development of the Power Drum:

Glenovich and Dontos are skillful and efficient purse-seiners fishing for many years past in Puget Sound in the State of Washington and British Columbia waters and for the last ten years or so in Alaska waters.

Following World War II, in conjunction with other purse-seiners, Glenovich developed and was one of the first commercial fishermen to use successfully a large power-operated drum or reel on the stern of his boat, which enabled him to retrieve the net, and thus close the circle much more rapidly and with much less effort, since the net and the lines wound up on the drum like an ordinary fishing line winds up on a reel. Previously, it has been necessary for the net to be hauled aboard either by hand (in the early days of purse-seining), or by the use of a "power block", a power-operated pulley which although it was a considerable improvement over hand retrieval, was still inefficient, since it did not store the net on the pulley and it

was necessary for at least four men of an average seven-man crew to carefully pile the net and lines as they were retrieved so they would not become tangled. The "drum", as it came to be called, eliminated the necessity for piling the net and lines, greatly reduced labor costs, promoted a much safer operation, speeded up fishing, and made it dramatically more economically efficient and profitable, since the standard purse-seiner could be conveniently operated with four or five men instead of six or seven. All this was accomplished at only a modest cost, since virtually all existing purse-seine vessels could be modified to install a drum, and the net and attendant gear remained identical.

The increased efficiency of the power drum over the power block method of retrieving the seine is manifested in a faster retrieval. Accordingly, more sets of the seine (returning the seine to the fishing water for another catch) can be made in a given period of time. Theoretically the drum retrieval operation will take more fish under given unregulated times and areas than the block. The experts' opinions vary as to whether the drum operation will take more fish than the block over the period of the regulated time and area fishing season. The drum operation will take more fish during the scattered and light early and late runs.

Today the drum seine is generally regarded as standard equipment and the state of the art on purse-seine vessels in Washington State and British Columbia.

### CHALLENGED STATUTE

Section 1, Chapter 26 of the Session Laws of Alaska, 1959, as amended by Section 1, Chapter 107 of the Session Laws of Alaska, 1962, now codified as AS 16.10.120 reads as follows:

"Sec. 16.10.120. Use of drum or reel in operation of purse seine. It is unlawful for a person to use, employ, or operate a drum or reel around which a purse seine is coiled, rolled, or looped for purposes of taking or removing

fish from a body of water located on or over lands or tidelands owned by the state or over which the state has jurisdiction. This section does not prevent the use of power blocks or the use of a reel mounted on a seine skiff to haul in or let out the separate purse seine lead which is temporarily connected to the purse seine proper, as these terms are generally employed or used in the fishing industry."

Here follows penalty and forfeiture provisions.

The Department has adopted regulations to supplement the statute.

Effect of Statute:

Since 1959 and the enactment of the statute and adoption of regulations Glenovich and Dontos have been faced with making a choice between not fishing for salmon in Alaska or removing their drums before going there, which they have elected to do. Their general pattern, and that of other Puget Sound based salmon purse-seiners equipped with drums, has been to remove the drum in the spring before leaving for Alaska and to install a power block. Then, upon returning from Alaska following the close of the season there, salmon fishing continues in Puget Sound waters and the power block is generally removed and the drum reinstalled. The removal and reinstallation of the drum involves some expense and some delay each time it is done.

## FEDERAL CONSTITUTIONAL ISSUES

Glenovich and Dontos specifically challenge the statute and regulations as:

1. establishing an unreasonable burden on interstate commerce and thereby forbidden by Article 1, Section 8 of the United States Constitution;

2. depriving them of equal protection of the laws as guaranteed by the Fourteenth Amendment of the United States Constitution and

3. being a form of discrimination against them as non-residents by the State of Alaska which violates the privileges and immunities clause of Article IV, Section 2 of the United States Constitution.

Noerenberg and Chapple make issue with these contentions and urge this court to abstain from ruling on the merits of this cause and defer to an adjudication thereof by the courts of the State of Alaska.

## ABSTENTION

■ It now appears that no issue is presented herein inviting a state judicial resolve:

a) under uncertain Alaska state law

b) of a probable construction or interpretation of the statute, ". . . that would avoid or modify the (federal) constitutional question",

c) of a complex state statutory scheme of regulation or other police power protection or

d) in obedience to an urgent consideration of comity in federal-state relations. *Wisconsin v. Constantineau,* 400 U.S. 433, pp. 437–439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)

The federal constitutional issues have been directed to this court and the resolve is our chore. *Robb v. Connolly,* 111 U.S. 624, 637, 4 S.Ct. 544, 28 L.Ed. 542 (1884) cited with approval in Lake Carrier's Ass'n v. Mac Mullan, 406 U.S. 498, p. 510, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972).

"The paradigm case for abstention arises when the challenged state statute is susceptible to 'a construction by the state courts that would avoid or modify the [federal] constitutional question.' " *Lake Carrier's, supra,* p. 510, 92 S.Ct. p. 1757.

The statute is clear and succinct in particulars which distinguishes it from the challenged ambiguous statute dealt with through abstention in *Lake Carrier's, supra.*

There is no pending state proceedings challenging the statute under state or federal law or constitution and we can

find no justification under a spirit of comity in state-federal relations for "the delay and expense to which application of the abstention doctrine invariably gives rise . . ."

We conclude abstention on the part of this court is not proper.

## DISCUSSION ON THE MERITS

At the threshold we must recognize and keep in mind that under present Alaska constitutional provision all fishermen enjoy free entry into Alaska's salmon fisheries. Therefore, any preservation and conservation of the fisheries must come through legislative and Department regulation of boat size, gear and use thereof and time and area of fishing.

Noerenberg and Chapple contend that the challenged statute and supplementary Department regulations are based upon legislative policy and is a lawful and constitutional exercise of Alaska's police power in conservation and management of its fisheries. We agree as taught by Le Clair v. Swift, 76 F.Supp. 729, at 733 (E.D.Wisc.1948):

> "It is not only the right, but the duty, of the State to preserve for the benefit of the general public, the fish in its waters from destruction or undue reduction, in numbers, whether caused by improvidence or greed of any interests. As trustee for the people, in the exercise of this right and duty, the State may conserve fish and wildlife by regulating or prohibiting the taking of same, as long as such action does not violate any *organic law of the land.* (Italics supplied) It is well established by the authorities that by virtue of residual sovereignty, a State, as the representative of its people and for the common benefit of all its citizens, may control the fish and game within its borders, and may regulate or prohibit such fishing and hunting. Manchester v. Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891); Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385

(1894); . . . ., subject however to the absence of conflicting federal legislation." Skiriotes v. Florida, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941). *See also,* Corsa v. Tawes, 149 F.Supp. 771 (D.C.Md.1957), aff'd 355 U.S. 37, 78 S.Ct. 116, 2 L.Ed.2d 70; Alaska v. Arctic Maid, 366 U.S. 199, p. 203, 81 S.Ct. 929, 6 L.Ed.2d 227 (1961), citing Skiriotes, *supra;* Thomson v. Dana, 52 F.2d 759, pp. 761–762 (D.C.Or.1931) and Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 318, 63 S.Ct. 602, 87 L.Ed. 777 (1943).

The evidence reveals marked difference of opinion held by the parties' experts as to the need or of the effectiveness of the statute and regulations in producing the desired effect upon salmon population and fishery management; also, there is the economic controversy of a more safe and profitable perman drum operation vs less safe and profitable per man power block operation. These differences and controversies are of legislative concern and policy and not judicial as gleaned from this judicial reasoning:

> (t)he need for and the effectiveness of various measures regulating the practices, places, and instrumentalities of fishing, have been argued at length at almost every legislative session.

> Opinion as to many of these matters is sharply divided, both as to whether particular regulatory provisions have the desired result upon fish population, and also as to the social policy that the State should follow in the management of its resources. It is a difficult problem or complex of problems, and the issues cannot be resolved for all time by any single enactment. Questions as to the adequacy of existing laws bring serious conflict, and no one is in a position to demonstrate absolutely to what point certain protective measures are no longer required. Wide fluctuation in the abundance of various species is not unknown and is a fact acknowledged by the plaintiffs' witnesses.

Men disagree as to what is a reasonable and benign utilization of natural resources, and what is destructive exploitation.

Where should these conflicts be resolved? Certainly the courts are not the appropriate forum. These matters are peculiarly legislative in character, and not within the judicial sphere. *Corsa,* id. 149 F.Supp. 771 at p. 775.

Again the court in Thomson v. Dana, *supra,* dealing with an Oregon statute outlawing boat fishing in parts of the McKenzie River remarked at 52 F.2d 759 at page 763:

"The history of legislation regulating fishing is replete with statutory prohibition of various devices which the particular state for the time conceived were peculiarly destructive of fish. Provisions against seines, nets, traps, dams, and weirs are widespread, and in many cases antedate the Federal Constitution. Snag pole, set lines, spears and tipups have been forbidden in various jurisdictions. (citing cases) Such regulations have been acquiesced in by the people thereof, because they have been recognized as reasonable restriction."

"Regulation forbidding any other method of fishing except by a pole and line have been upheld. Peters v. State, 96 Tenn. 682, 36 S.W. 399, 33 L.R.A. 114. This court has held, three judges sitting, that fish-wheels could be forbidden on the Oregon side of the Columbia river above a specified point, notwithstanding the provision of a compact between the states of Oregon and Washington. P. J. McGowan & Sons v. Van Winkle, (D. C.) 21 F.2d 76, affirmed 277 U.S. 574, 48 S.Ct. 435, 72 L.Ed. 995. From every historical standpoint, therefore, the present classification is justified, since it is only a question of a greater degree of the same type of discrimination and the question is generally for legislative determination." See Lube-

tich v. Pollock (D.C.) 6 F.2d 237, 242 (N.D.Cal.1925); [Bayside Fish Flour Co. v. Gentry, 297 U.S. 422 (1936) at p. 428, 56 S.Ct. 513, 80 L. Ed. 772].

". . . if it appears that reasonable classifications have been made in an effort to protect fish, the property of plaintiffs (banned fishing boats) has not been taken. For, in the enforcement of statutes looking towards the conservation of the food fish in a particular state, special instruments of violation may appropriately be outlawed, regardless of the time of acquisition. Miller v. McLaughlin, 281 U.S. 261, 50 S.Ct. 296, 74 L.Ed. 840 (1930); Lawton v. Steele." *supra.*

Given the legislature's power to enact legislation based on its determination of state policy and appraisal of the goals desired and the means available, "(a) law having a reasonable relation to such object and its accomplishment, and which is not unduly oppressive upon individuals must be upheld as a legitimate exercise of the state's police power without inquiry into the possible soundness of legislative judgment in the premises, and without consideration for possible individual hardships." Mirkovich v. Milnor, 34 F.Supp. 409, 411 (N.D. Cal.1940).

It is manifest that the statute and aiding regulations are in furtherance of Alaska's fishery management program and the power drum prohibition has a rational relationship to that program. *Bayside Fish Co., supra,* 297 U.S. 422, pp. 427–428, 56 S.Ct. 513. While the power drum equipped purse-seiners have to do some gear refitting of their vessels at some expense and utilize a larger crew under the power block operation in order to fish lawfully in Alaska's waters their vessels are not outlawed as were the McKenzie River boats, and we cannot say that conformance with the statute and regulations is unduly oppressive upon them under either due process or

equal protection and treatment federal standards. Their difficulty arises from their wish to fish with the power drum in waters under different governmental policy and gear use requirements.

## FEDERAL CONSTITUTIONAL ISSUES

Burden on Interstate Commerce:

■ Noerenberg and Chapple acknowledge that, while the act of fishing is purely local in character and therefore not within the purview of the commerce clause, Alaska v. Arctic Maid, *supra*, the fishing vessels are engaged in interstate commerce, Brown v. Anderson, 202 F.2d 96, 103 (D.C.Ark.1962), and agree that a state statute which unduly burdens the instrumentalities of commerce must fall. The conflict of state legislative burdening of interstate commerce vs. protection of important state interest has always held the attention of the federal courts. The result is a legion of judicial blends, always depending upon findings of the facts, from heavy burdens vs. slight state interests to slight burdens vs. important state interests. In the fishermen vs. management of fisheries field the authorities hold fast in holding the interests of the state in the management of its fisheries is of paramount significance and that the invasion into the realm of the commerce clause, if slight, is outweighed by the local benefits which the legislation is designed to achieve. *Corsa, supra.* In Bayside v. Gentry, *supra*, 297 U.S. 422 at p. 426, 56 S.Ct. 513 at p. 515, the court held:

"If the enforcement of the act affects interstate or foreign commerce, that result is purely incidental, indirect, and beyond the purposes of the legislation."

■ As found above the burden sustained by Glenovich's and Dontos' vessels while engaged in interstate commerce to lawfully take fish in Alaska's waters is their periodic refitting with the drum which they have annually undergone. We think this burden, if it be a burden, is indeed slight and purely incidental, indirect and not beyond the legislative protection of a vital state interest.

Equal Protection and Discrimination:

■ Glenovich and Dontos read into the statute and Department regulations latent, in fact, discriminatory effect in that they are drum-seining non-residents of the State of Alaska and are outlawed as distinguished from block-seining residents who are permitted to fish and thereby favored. We think these contentions of unequal treatment and protection under the Fourteenth Amendment and discrimination violative of Article IV, Section 2 are untenable. The statute and Department regulations supplementing the statutes on their face and in operative effect outlaw all purse-seining vessels equipped with power drum retrieval systems whether the owners are non-residents or residents of the State of Alaska and without regard to citizenship, race, color or creed, or poor or rich. The power drum is illegal in Alaska. The fitting of the vessel with a power drum so she may fish in other waters at a deemed better advantage is voluntary by the owner.

No freedom of movement among the states concept or principle permits property legal to possess in one state to be carried to and possessed in another state which outlaws the property in furtherance of its policy of police protection.

In the field of fishery management see *Skiriotes, supra,* Corsa, *supra,* 149 F.Supp. pp. 776–777, Thompson v. Dana, *supra,* citing Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923 (1884) and Van Camp Sea Food v. Department of Natural Resources, 30 F.2d 111, pp. 113–114 (D.S.So.Cal.1929). *Corsa, supra,* at 776, points out that if Maryland deemed it necessary to prohibit purse nets it could do so despite the fact that New York and New Jersey had different regulations.

CONCLUSIONS

We conclude that:

a) Section 16.10.120 and the Department's regulation supplemental thereto are a valid and lawful legislative exercise of the police power vested in the State of Alaska, and

b) are not violative of any United States Constitutional rights, privileges and immunities of Glenovich and Dontos under the Commerce Clause nor Article IV, Section 2 thereof.