ALVIN H. MAEDA and EDWARD LEE, Plaintiffs, and
CLARK S. TOGUCHI, Plaintiff-Appellant, *v.* RONALD
AMEMIYA, Attorney General, State of Hawaii, et al.,
Defendants-Appellees, and CASTLE & COOKE, INC.,
dba HAWAIIAN TUNA PACKERS, et al., Defendants-
Intervenors-Appellees

NO. 6081

MAY 1, 1979

RICHARDSON, C. J., OGATA AND MENOR, JJ., AND
RETIRED JUSTICE KOBAYASHI ASSIGNED BY REASON
OF VACANCY AND CIRCUIT JUDGE KATO IN PLACE
OF KIDWELL, J., DISQUALIFIED

*Per Curiam*. Plaintiffs, Alvin H. Maeda, Edward Lee and Clark S. Toguchi, filed an action for declaratory judgment in circuit court against Ronald Amemiya, Attorney General of the State of Hawaii, and Christopher Cobb, Director of the State Department of Land and Natural Resources (appellees), seeking to declare Hawaii Revised Statutes § 188-45 (1974) unconstitutional as violative of the equal protection clause of the fourteenth amendment of the United States Constitution, and sections 2 and 4, article I of the Hawaii State Constitution. Castle & Cooke, Inc., dba Hawaiian Tuna Packers, a Hawaii corporation, United Fishing Agency, a Hawaii corporation, and Tuna Boat Owners' Association of Hawaii, a non-profit Hawaii association (hereinafter also referred to as appellees), sought and were granted leave to intervene in the case. After trial, the court entered judgment in favor of appellees and dismissed plaintiffs' complaint with prejudice. From this judgment, Toguchi (appellant) appeals.[1]

We reverse in part and affirm in part.

The statute in dispute reads as follows:

> Sec. 188-45 Nehu and iao; penalty. Except as hereinafter provided, it shall be unlawful for any person to fish for, catch, or take in or from any of the waters within the jurisdiction of the State any nehu, iao, or marquesan

---

[1] The trial court determined that plaintiffs Maeda and Lee did not have standing to challenge the constitutionality of the statute "since plaintiff Maeda did not possess a commercial license at the time of the 1974 amendments and the commercial sales made by Maeda and Lee during periods in which they held commercial licenses were in any event de minimus." The court found that plaintiff Toguchi held a commercial fishing license at the time HRS § 188-45 was amended in 1974.

sardine; provided that any person may lawfully catch nehu for *his* family consumption *or bait purposes* with a net not longer than *fifty* feet; and provided further, that the department of land and natural resources may issue to commercial fishermen as defined in section 189-1 licenses to take nehu, iao, marquesan sardine, or any other species for which an open season may be declared by the department for use as bait *only; provided that nehu may be taken by any such licensed commercial fisherman only if he is employed on a live-bait tuna boat and only if his principal means of livelihood is derived from tuna fishing and the sale of tuna, and such nehu is not sold to others.* The licenses may be issued by the department upon such terms and conditions as the department may deem necessary to conserve the supply of such fish within state waters. Any such license may be summarily revoked for a violation of any term or condition thereof, and any or all such licenses may be revoked summarily whenever, in the judgment of the department, the action is necessary for the conservation of the fish. (Emphasis added.)[2]

A. CONSTRUCTION OF STATUTE:

The trial court concluded that the statute "provides plainly on its face for a three-tier classification system": (1) properly licensed commercial tuna fishermen, who could catch nehu with a net of unlimited size, (2) noncommercial fishermen, who could catch nehu for home consumption or for bait purposes with a net no longer than fifty feet, and (3) non-tuna commercial fishermen, who could not capture nehu at all.

In our opinion, the trial court clearly erred in its construction of the statute. Based on the language of the statute, the statute's legislative history, and the evidence presented at

---

[2] The emphasized portions represent the 1974 amendments to the statute. *See* Act 222, H.B. 2440, S.L.H. 1974.

trial, we conclude that HRS § 188-45 (1974) creates two classes of persons permitted to catch nehu: (1) properly licensed commercial tuna fishermen,[3] who may catch nehu with a net of unlimited size, and (2) all other fishermen (*i.e.*, commercial non-tuna fishermen and noncommercial fishermen), who may catch nehu for home consumption or for bait purposes with a net no longer than fifty feet.

This two-part classification is evident from the language of HRS § 188-45 (1974). The initial clause, which makes it unlawful for any person to catch or take nehu "[e]xcept as provided," is limited and qualified by three provisos. *Johnson v. School District of Wakefield*, 181 Neb. 372, 376-77, 148 N.W.2d 592, 595 (1967). The first proviso establishes that "any person," which included all commercial and noncommercial fishermen, may catch nehu for home consumption or bait purposes with a net not longer than fifty feet. The second proviso, qualifying the first proviso, states that commercial fishermen may obtain licenses to take nehu; this statement, however, is limited by the third proviso, which specifies that "such licensed commercial fishermen" may take nehu only if they are commercial tuna fishermen.

The two-part classification is also apparent from the legislative history of the statute. *Employees' Retirement System v. Chang*, 42 Haw. 532, 541 (1958); *Kamanu v. E. E. Black, Ltd*, 41 Haw. 442, 449 (1956). Nowhere, in the legislative history of HRS § 188-45 (1974), is there any indication that the legislature intended to prohibit licensed non-tuna commercial fishermen from catching nehu for home consumption or bait purposes with a limited net length.

The earlier predecessors of the present statute placed no restrictions on the taking of nehu for bait purposes[4] but provided that citizens could take nehu for family consumption

---

[3] Licensed commercial fishermen who are employed on live-bait tuna boats and whose principal means of livelihood is derived from tuna fishing and the sale of tuna, HRS § 188-45 (1974), will hereinafter be referred to as commercial tuna fishermen.

[4] The intent of Act 206, S.L.H. 1929, was "to conserve the bait fishes for the commercial fishermen." 1929 Senate Journal 15th Legis., S.C. Rep. 348 at 1004-05.

subject to limitations on net length. Act 206, Session Laws of Hawaii (S.L.H.) 1929 (twelve feet); Act 258, S.L.H. 1931 (twenty feet); Act 54, S.L.H. 1933 (forty feet); Act 54, S.L.H. 1943 (forty feet; one hundred feet for period ending ninety days after cessation of war). The two immediate predecessors of the present statute required commercial fishermen to obtain licenses in order to take nehu for bait purposes with nets of unlimited size[5] and provided that citizens [later amended to "any person"] could take nehu for bait purposes or family consumption with a net not longer than twenty-five feet. Act 179, S.L.H. 1947 (R.L.H. 1955, § 21-78); Act 101, S.L.H. 1961 (HRS § 188-45).

Committee reports on H.B. 2440, Act 222, S.L.H. 1974, which amended HRS § 185-45 to its present form, expressly indicate legislative intent that only properly licensed commercial tuna fishermen be permitted to use nets of unlimited size to take nehu. 1974 House Journal, 7th Legis., S.C. Rep. 109 at 607-08; 1974 Senate Journal, 7th Legis., S.C. Rep. 151 at 829.[6] As discussed above, the present statute provides that

---

[5] A committee report on S.B. 313, Act 179, S.L.H. 1947, stated:

The purpose of this bill is to conserve the bait supplies of nehu and iao within the Territory.

. . . .

The dimunition [sic] of bait supplies for the fishing industry is a matter of great concern to the Commissioners of Agriculture and Forestry and to the Territory generally.

1947 Senate Journal, 24th Legis., S.C. Rep. 306 at 818-19.

[6] The committee reports state as follows:

The purpose of this bill is to amend section 188-45, Hawaii Revised Statutes with specific reference to the *taking of live baitfish by licensed commercial fishermen.*

Your Committee upon consideration of this bill recommends that it be amended to provide that the department of land and natural resources may issue licenses to commercial fishermen to take nehu, iao, marquesan sardine, or any other species for which an open season may be declared for bait purposes only *with the further provision that nehu may be taken for bait purposes by licensed commercial fishermen only, if his principal means of livelihood is derived from tuna fishing and that the nehu is not sold to others.* (Emphasis added.)

1974 House Journal, 7th Legis., S.C.Rep. 109 at 607-08.

The purpose of this bill is to make it unlawful for any person to catch any nehu, iao, marquesan sardine in waters under the jurisdiction of the State, provided

any person may take nehu for his family consumption or for bait purposes with a net no longer than fifty·feet.

Furthermore, the two-part classification is consistent with the construction given to HRS § 188-45 (1974) by the Division of Fish and Game of the State Department of Land and Natural Resources. *Keller v. Thompson*, 56 Haw. 183, 190, 532 P.2d 664, 670 (1975). The record indicates that since 1974, the Division of Fish and Game has been administering the statute as creating two classifications: (1) properly licensed tuna fishermen, who could catch nehu with a net of unlimited size, and (2) all other commercial and recreational fishermen, who could catch nehu for home consumption or bait purposes with a net no longer than fifty feet.

B. EQUAL PROTECTION:

> The trial court concluded as follows:
> [T]he Nehu Statute, as amended in 1974, is a constitutional exercise of the State of Hawaii's police power and does not violate the equal protection or due process[7] provisions of either the State or Federal Constitutions. While the Nehu Statute is an economic regulatory measure which must satisfy only the "rational basis" standard of constitutional review, the Court finds that the statute is constitutional even under the "compelling interest" or "strict scrutiny" standard of review because

---

that any person may lawfully catch nehu for family consumption or bait purposes with a net no longer than twenty-five feet [later amended in S.D. 1 to "fifty feet"]. *The Department of Land and Natural Resources may issue a commercial license to take nehu, iao, marquesan sardine, provided that nehu can only be taken by a licensed commercial fisherman and only if he is employed on a tuna boat from which is derived his principal means of livelihood.*

Your Committee finds that nehu are the only fish that presently can be used by tuna fishermen for bait purposes, and the supply of nehu is limited; presently the only major concentrations of nehu are found in the Pearl Harbor and Kaneohe Bay areas. Your Committee also finds that *anyone may now purchase a commercial fishing license entitling them to catch and sell large numbers of nehu,* and *unless such action is taken to regulate nehu fishing the tuna industry may decline as a result of excessive competition.* (Emphasis added.)
1974 Senate Journal, 7th Legis., S.C. Rep. 151 at 829.

[7] On appeal appellant did not raise the issue of due process.

of the State's compelling interest in protecting and expanding the domestic Aku[8] industry.

Whether HRS § 188-45 (1974) stands in violation of the equal protection clause involves essentially an examination of three criteria: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification. *Dunn v. Blumstein*, 405 U.S. 330, 335 (1972); *York v. State*, 53 Haw. 557, 558, 498 P.2d 644, 645-46 (1972).

We first examine the character of the classification to determine whether the rational basis or strict scrutiny standard of review is appropriate. *Nachtwey v. Doi*, 59 Haw. 430, 442, 583 P.2d 955, 960 (1978). Equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312 (1976); *Nachtwey v. Doi, supra*, 59 Haw. at 440-41, 583 P.2d at 959.

Appellant does not contend, and we do not find, that any suspect class is involved herein.

Appellant contends that HRS § 188-45 (1974)

interferes with [appellant's] fundamental right to work, guaranteed under our State Constitution, Art. I, sec. 2,[9] and that the statute should be subject to the strict scrutiny standard of review because the right to work is a fundamental constitutional right.

In *York v. State, supra*, we held that

[s]uch a fundamental interest as the right to work and thereby sustain one's self and family cannot be impinged absent a showing of a rational relationship to a countervailing legitimate interest on the part of the State.

---

[8] In local usage "aku" means tuna. Pukui, Elbert, Hawaiian Dictionary (1971) defines "aku" as bonito, skipjack.

[9] Hawaii Constitution, art. I, sec. 2, states:

All persons are free by nature and equal in their inherent and inalienable rights. Among these rights are the enjoyment of life, liberty and the pursuit of happiness, and the acquiring and possessing of property.

*Id.* at 560, 498 P.2d at 646. The right to work, that is, "the right of the individual to engage in any of the common occupations of life," is secured by the due process provisions of the Federal and State Constitutions. *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923); *Dent v. West Virginia,* 129 U.S. 114, 121 (1889). *See* L. Tribe, American Constitutional Law (1978) at 508, 532.

Yet, in the context of equal protection analysis, where there has been no showing that the statute operates to the peculiar disadvantage of a suspect class, the right to work, as a constitutionally protected right, does not invoke the application of the strict scrutiny standard. *Massachusetts Board of Retirement v. Murgia, supra* at 314;[10] *Hicklin v. Orbeck,* 565 P.2d 159, 166 (Alaska 1977); *Commonwealth v. Henry's Dry Wall Co., Inc.,* 366 Mass. 539, 542, 320 N.E.2d 911, 914 (1974).[11] *See Stockton v. Parks and Wildlife Commission,* 571 S.W.2d 338, 343 (Tex. Civ. App. 1978). Where economic interests are concerned, the rational basis test is the proper standard. *Dandridge v. Williams,* 397 U.S. 471, 485 (1970). *See Baldwin v. Fish and Game Commission of Montana,* 436 U.S. 371, 390 (1978); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 814 (1976).

We turn then to examine the statutory classification under the rational basis standard. The test of constitutionality is whether that statute has a rational relation to a legitimate state interest. *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 489 (1977); *Nachtwey v. Doi, supra,* 59

---

[10] In *Massachusetts Board of Retirement v. Murgia, supra,* the United States Supreme Court said:

> [W]e have expressly stated that a standard less than strict scrutiny "has consistently been applied to state legislation restricting the availability of employment opportunities."

*Id.* at 313. *See* Dandridge v. Williams, 397 U.S. 471, 485 (1970).

[11] In Commonwealth v. Henry's Dry Wall Co., Inc., *supra,* 366 Mass. at 542, 320 N.E.2d at 914, the court stated:

> [N]either the United States Supreme Court nor this court has ever held that the right to work or to pursue one's business is a fundamental right infringement of which deserves strict judicial scrutiny.

Haw. at 441-42, 583 P.2d at 959. As the United States Supreme Court said regarding the rational basis standard:

> [A] statutory classification impinging upon no fundamental interest, and especially one dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it. (Citation omitted.) That [the state] might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional.

*Hughes v. Alexandria Scrap Corp., supra* at 813. *See Baldwin v. Fish and Game Commission of Montana, supra* at 390.

The purposes of HRS § 188-45 (1974) are conservation, allocation, and enforcement. The conservation objective was explicitly stated in several committee reports on Act 222, H.B. 2440, which amended HRS § 188-45 to its present form:

> The purpose of this bill is to amend section 188-45, Hawaii Revised Statutes with specific reference to the taking of live baitfish by licensed commercial fishermen.

1974 House Journal, 7th Legis., S.C. Rep. 109 at 607-08.

> The purpose of this bill is to make it unlawful for any person to catch any nehu, iao, marquesan sardine in waters under the jurisdiction of the State, provided that any person may lawfully catch nehu for family consumption or bait purposes with a net no longer than twenty-five feet [later amended in S.D. 1 to "fifty feet"]. . . .

> Your Committee finds that nehu are the only fish that presently can be used by tuna fishermen for bait purposes, and the supply of nehu is limited; presently the only major concentrations of nehu are found in the Pearl Harbor and Kaneohe Bay areas. Your Committee also finds that anyone may now purchase a commercial fishing license entitling them to catch and sell large numbers of nehu, and unless such action is taken to regulate nehu fishing the tuna industry may decline as a result of excessive competition.

1974 Senate Journal, 7th Legis., S.C. Rep. 151 at 829. The conservation objective was also expressed in the testimony of the head of the Division of Fish and Game of the State De-

partment of Land and Natural Resources, who stated:

> An assessment of the bait catch indicated to us that the bait catch has been increasing and there was some indication that if uncontrolled, the taking of the nehu was uncontrolled, that we would be exceeding the maximum sustained yield of that population. In other words, we were taking precautionary methods to prevent the depletion of the resource.

The statutory purpose of allocation was explained by the head of the Division of Fish and Game as follows:

> The reason for our support [of Act 222] was to resolve conflicting demands for a supply — a resource that was in short supply and to reallocate this limited resource in the best — what we thought would be in the best interest of the State.

As for the enforcement objective, the head of the Division of Fish and Game testified that the Division had been "receiving increasing number of complaints about alleged illegal sale of nehu, for purposes other than bait." He testified that, in formulating a position on Act 222, his Division had recommended limiting the length of the net rather than limiting the quantity of nehu to be taken, "[f]or ease of enforcement." He explained:

> Well, it's easier to enforce the net regulation because the net cannot be readily disposed of. If a person is caught using a net more than fifty feet long they will not be able to destroy the evidence before our enforcement officers would be able to approach him. On the other hand, to enforce a bag limit, assuming that the fisherman has exceeded the bag limit — his bag limit — before the enforcement officers approached this person he would have ample opportunity to drop or to dispose of the excess.

The Division head also stated that limiting the length of the net would reduce the problems of poaching and roiling.[12]

---

[12] The Division head defined "roiling" as "disturbing the water causing siltation, stirring up the water."

In our opinion, the state has a legitimate interest in the conservation of nehu, *Glenovich v. Noerenberg,* 346 F.Supp. 1286, 1291 (D. Alaska 1972); *Stockton v. Parks and Wildlife Commission, supra* at 343; *Washington Kelpers Association v. State,* 81 Wash.2d 410, 417-18, 422, 502 P.2d 1170, 1174, 1176-77 (1972), in the allocation of this limited resource among groups it may designate, *Baldwin v. Fish and Game Commission of Montana, supra* at 390; *State v. Alley,* 274 A.2d 718, 721-22 (Me. 1971), and in the enforcement of its wildlife regulations. *Herscher v. State, Department of Commerce,* 568 P.2d 996, 1006 (Alaska 1977); *Washington Kelpers Association, supra,* 81 Wash.2d at 417-18, 422, 502 P.2d at 1174, 1176-77.

Appellant contends that the statutory classification constitutes "arbitrary and capricious discrimination," favoring the commercial tuna fishermen over "other commercial . . . non-tuna fishermen."

The record indicates that the state, recognizing the limits of the nehu population, attempted to "resolve conflicting demands for a supply" and "reallocate this limited resource . . . in the best interest of the state." The following findings of the trial court are relevant factors in differentiating between commercial tuna fishermen and all other commercial and noncommercial fishermen:

3. The Aku industry is the most important commercial fishery in Hawaii, providing the State's only significant fish product for export. The State of Hawaii and the United States Government have spent hundreds of thousands of dollars in attempting to develop and expand the Aku fishery.

4. The Aku industry yielded an average of 10 million pounds of Aku per year during calendar years 1970 through 1974, valued at approximately $2.5 million per year to the Aku fishermen. By contrast, the total reported commercial catches of Omaka during this same period averaged less than 1500 pounds annually and were valued at less than $1000 per year.

5. The domestic Aku fleet relies heavily on the use of Nehu as live bait for its fishing operations, and the limited

supply of this baitfish is considered to be the primary bottleneck to expansion of the Hawaiian Aku fishery.

6. On the basis of statistics kept by the Division of Fish and Game and the individual experiences of plaintiffs, the yield per pound of Nehu is much greater when the Nehu is used as live bait to catch Aku than when it is used as dead bait by plaintiffs in catching Omaka.

. . . .

8. There is ample evidence from which a rational legislature might conclude that an Omaka fisherman is able to catch ample Nehu with a 50-foot net to satisfy his fishing requirements.

In view of the above findings of fact, *Buffandeau v. Shin,* 60 Haw. 280, 281, 587 P.2d 1236, 1237 (1978); *Sandstrom v. Larsen,* 59 Haw. 491, 501-02, 583 P.2d 971, 976 (1978), we conclude that the statutory classification is rationally related to the conservation and allocation purposes of the statute. As we said in *Hasegawa v. Maui Pineapple Company,* 52 Haw. 327, 329, 475 P.2d 679, 681 (1970):

> The guarantee of the equal protection of the laws, found in both the Hawaii and Federal Constitutions, was not intended to interfere with the power of the State to prescribe regulations to promote the general welfare of the people. *Nor was it intended that the demand for equal protection require that all laws apply universally to all persons and that they never classify when imposing special burdens upon or granting special benefits to distinct groups. It has been recognized that a state cannot function without classifying its citizens for various purposes and treating some differently from others.* (Citations omitted.) However, in exercising this right to classify in order to achieve social goals the legislature may not act arbitrarily; that is, the classification of a particular group as a subject for regulation must be reasonable in relation to the purpose of the legislation. . . . (Emphasis added.)

Appellant contends that the legislature "could have chosen a more reasonable means" of achieving the legislative objective of conserving nehu by setting a quantity control

quota or bag limit for catching nehu for bait for commercial tuna fishermen and other commercial fishermen.

In our opinion, the fifty-foot net limitation is rationally related to the enforcement objective of the statute. We agree with the trial court's conclusion that

> a consideration of enforcement questions, including limiting the potential for abuse, and problems of resource management, such as reducing the overlapping of fishing grounds so as to minimize "roiling," suggests that a rational legislature could easily have concluded that net-size limitation is a far better approach to the Nehu problem than is a bag limit.

As the United States Supreme Court said in *Baldwin v. Fish and Game Commission of Montana, supra:*

> Rationality is sufficient. That standard, we feel, has been met [herein]. So long as constitutional requirements have been met, as we conclude is the case here, "[p]rotection of the wild life of the State is peculiarly within the police power, and the State has great latitude in determining what means are appropriate for its protection." (Citation omitted.)

*Id.* at 391.

We, therefore, hold that HRS § 188-45 (1974) is not violative of the equal protection guarantees of the Hawaii and United States Constitutions.

*Kazuhisa Abe (Abe & Abe* of counsel) for plaintiff-appellant.

*Lester Wong,* Deputy Attorney General *(Susan Y. M. Chock,* Deputy Attorney General, on the brief) for defendants-appellees.

*David J. Reber (Goodsill, Anderson & Quinn* of counsel) for defendants-intervenors-appellees.