125 P.3d 461

**CHILD SUPPORT ENFORCEMENT AGENCY, State of Hawai'i, Plaintiff–Appellee**

v.

**John DOE, Defendant–Appellant**

and

**Jane Doe, Defendant–Appellee.**

No. 24457.

Supreme Court of Hawai'i.

Dec. 27, 2005.

Steven L. Hartley, Honolulu, and Jen–L. W. Lyman of Stirling & Kleintop, on the briefs, for defendant-appellant John Doe.

Huilin Dong, on the briefs, for defendant-appellee Jane Doe.

Rosemary McShane and Trina Yamada, Deputies Corporation Counsel, on the briefs, for plaintiff-appellee Child Support Enforcement Agency, State of Hawai'i.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ., Intermediate Court of Appeals Judge LIM, in place of ACOBA, J., unavailable, and Circuit Judge NAKAMURA, assigned by reason of vacancy.

## Opinion of the Court by NAKAYAMA, J.

Defendant-appellant John Doe (hereinafter "the father") appeals from the July 6, 2001 order, findings of fact, and conclusions of law of the Family Court of the First Circuit, the Honorable John C. Bryant, Jr. presiding, establishing John Doe as the father of the child in question, ordering the father to pay child support, arrearages, and birth-related expenses, and allocating expenses for the child's future medical expenses equally between the parents.

On appeal, the father argues that (1) the Hawai'i Uniform Parentage Act (HUPA), Hawai'i Revised Statutes (HRS) chapter 584, is unconstitutional because it violates the father's rights to privacy and equal protection under the Hawai'i Constitution and the United States Constitution (a) by violating the father's right to procreational autonomy and (b) by creating an improper gender-based classification; and (2) insofar as the father is an unemployed student, the family court violated the father's right to be free from compulsory service when it ordered him to pay child support in the amount of fifty dollars per month, because the father would be forced to get a part-time job.

Each of the father's arguments is manifestly and palpably without merit. First, the father failed to raise the question of equal protection at trial or in his pretrial legal memoranda; consequently, the issue is waived. Second, the father is entitled only to a "rational basis" review of HUPA because: (1) HUPA does not implicate the father's fundamental privacy right to procreational autonomy, but rather his economic interest in not supporting his child; and (2) even if the father hadn't waived his equal protection argument, his standing to raise the challenge would be based on a non-suspect classification, *i.e.*, the biological relationship of fathers to their children. Because HUPA bears a rational relation to the public welfare, it survives our rational-basis review, and the father's procreational autonomy arguments (as well as his waived equal protection arguments) fail. Finally, an obligation to financially support one's child and to become employed if necessary to meet the obligation is in no way comparable to peonage or slavery. It is well-settled that child support is an obligation that may be compelled, *even by imprisonment*, without violating the right to be free from involuntary servitude; *ipso facto*, the family court did not exceed its authority by ordering the father to pay the minimum amount of child support allowed by the then-applicable guidelines.

For the reasons that follow, we affirm the family court's order, findings of fact, and conclusions of law. We also notify the parties that the appeal was frivolous and request briefing with regard to damages and costs to be awarded to CSEA as authorized by Hawai'i Rules of Appellate Procedure (HRAP) Rule 38.

## I. BACKGROUND

### A. Factual Background[1]

The mother and father met while they were both in high school; they dated inter-

---

1. The mother and father stipulated to facts for the April 4, 2001 trial precedent to the order from which this appeal is taken. Except as otherwise indicated, the factual background is drawn directly from the stipulated facts, as modified and expanded by the trial court's findings of fact in the order from which this appeal is taken.

mittently for approximately fourteen months. During the course of their relationship, the couple agreed to always engage in "safe sex" and did not intend to procreate. The trial court found that it was reasonably foreseeable by both parties that an unwanted pregnancy could occur if the parties relied on the use of condoms as a method of birth control.

The mother became pregnant due to a failure in either the construction or use of a condom; this pregnancy was not planned. After the mother became pregnant, the prospective parents discussed and considered the possibility that the mother might undergo an abortion or seek an adoptive placement for the child with the father's consent and cooperation. However, the trial court found that the parties never entered into an express agreement that the mother would have an abortion or place the child up for adoption. Ultimately, after discussing the pregnancy with her family and despite the child's father's objection, the mother decided to raise the child with her family's help. The father strongly opposed the mother's decision to keep the child because he believed that he and the mother were unable to support a child emotionally or financially and because he believed that they were too young to care for a child. The parents' sexual relationship continued through the sixth month of the pregnancy.

The mother gave birth to the child at issue in these proceedings (hereinafter "child") on March 22, 2000. The Department of Human Services (DHS) paid $878.13 for medical expenses related to the birth of the child. At the time of the trial, DHS had paid $6,203 in cash assistance to the mother for the benefit of the child.

## B. Procedural History

On July 10, 2000, the Child Support Enforcement Agency (CSEA) filed an amended complaint for establishment of paternity pursuant to HRS § 584–6.[2] In connection with that complaint, the mother and father stipulated to genetic testing. The test results indicated a 99.99% probability that the party referred to here as "the father" is the biological father of the child. In light of the test results, the father did not contest that he is the biological father of the child, but nevertheless objected to being named as the child's legal father and to being ordered to provide any past or future support for the minor child. Pursuant to HRS § 346–37.1,[3] DHS, through CSEA, sought, *inter alia*, reimbursement of certain public assistance monies paid for the benefit of the child and such other relief as might be appropriate. Specifically, CSEA sought ongoing child support payments, child support arrearages, and $439.07 for birth-related expenses from the father.[4]

On December 21, 2000, a pretrial conference was held before the Honorable John C. Bryant. Following this conference, a judgment of paternity was entered. Sole physical and legal custody of the child was awarded to the mother. The court reserved judgment with respect to allocation of birth expenses, child support, and arrearages. A hearing on the reserved issues was set for February 7, 2001. On February 5, 2001, the father filed a pre-hearing legal memorandum in which he alleged that the mother had promised he would not be subject to financial responsibility for the child and asserted that his fundamental right to decide whether to have a child would be violated if he were required to accept financial responsibility for the child:

> The *Roe* case, of course, specifically dealt with a *woman's* right to procreate. However, the Supreme Court in *Roe* also recognized that the state has an interest in regulating decisions (such as abortion) if

2. HRS § 584–6 (1993) provides in relevant part: "[T]he child support enforcement agency may bring an action for declaring the existence or nonexistence of the father and child relationship...."

3. HRS § 346–37.1 (Supp.2000) provides in relevant part: "Any payment of public assistance money made to or for the benefit of any dependent child creates a debt due and owing to

[DHS] by the natural or adoptive parent or parents...."

4. Because the father was a student at the time these proceedings were initiated, no income was imputed to him in calculating his child support obligation. Consequently, his obligation amounted to $50 per month under the guidelines then in effect.

such an interest is "compelling." *Roe[v. Wade]*, 410 U.S. at 155, 93 S.Ct. 705. If the State has such an interest, surely the natural father also has an interest.

Simply put, if a woman has a Constitutional right to procreate, so should a man. It is completely unfair and unjust for a woman to force a man to have a child against his will and then force him to provide financial and other support for that child. That is exactly what happened in the instant case.

. . . .

Obviously, [the father] could not force [the mother] to have an abortion or give the child up for adoption. That would violate her Constitutional rights. However, [the mother] should not be allowed to force [the father] to take up a role and responsibilities he clearly did not want and which she promised him he would not have to bear. That would violate *his* Constitutional rights.

The father also asserted that, because he was a full-time university student, he "simply [couldn't] afford to take care of a child." Consequently, any imposition of a financial obligation to support his child would be tantamount to slavery and unconstitutional:

The Thirteenth Amendment to the United States Constitution provides that involuntary servitude shall not exist in the United States and gives Congress the power to enforce the article by appropriate legislation. In 1867, Congress enacted the Antipeonage Act . . . .

In interpreting this Act, the United States Supreme Court has held that "Congress has put it beyond debate that no indebtedness warrants a right to be free from suspension of compulsory service." Imposing even a minimum financial requirement on [the father] in this case would be violative of his right to be free from compulsory service and therefore tantamount to involuntary servitude.

It was [the mother's] choice to have this child. She chose to do so over [the father's] objections and while assuring him that she (and her parents) would raise the child themselves with no help of any kind from him. [The mother] broke her agreement with [the father] and, as a result, the State of Hawai'i is now attempting to require [the father] to accept financial responsibility for the child. This is unfair, unjust, and unconstitutional.

At the February 7, 2001 hearing, Judge Bryant scheduled a short trial for April 4, 2001 and ordered the parties to prepare a list of stipulated facts. Following the trial, the court granted the relief requested by CSEA's amended complaint. In the trial court's findings of facts and conclusions of law, in addition to the stipulated facts, the court found, *inter alia*, that "[i]t was reasonably foreseeable by both parties that an unwanted pregnancy could occur through the use of a condom," and that the parties never had a "meeting of the minds regarding abortion and adoption and therefore there was no explicit agreement that [the mother] would have an abortion or place the child up for adoption." The court concluded, *inter alia:* (1) that the father had no inherent or constitutional right of privacy to denounce, repudiate, or rescind his duties as the natural father of the child; (2) that *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), does not apply to a father's right to choose whether or not to procreate; and (3) that fathers have a right to be free from procreation when they choose not to engage in sexual intercourse. In the July 6, 2001 order from which this appeal is taken, the trial court determined, *inter alia*, that the father was the natural father of the subject child, that the father was liable for child support in the amount of $50 per month, that the father was liable for child support arrearages in the amount of $600, that the father was liable for birth-related expenses in the amount of $439.07, that medical expenses for the child would be shared equally by the mother and father on an ongoing basis, that all prior orders not inconsistent with the final order would remain in full force and effect, and that there would be no stay of the order pending appeal.

The father timely appealed. The father also moved for a stay of the trial court's order and findings of fact and conclusions of law pending appeal, on the grounds that:

[The father had] raised an issue of first impression in Hawai'i. For this reason, it is difficult to predict the likelihood of his success on the merits (although [the father] firmly believes that he will be successful on appeal). However, it *is* clear that irreparable injury to [the father] will result if he is forced to meet his court ordered obligations. [The father] is a student at the University of Hawai'i at Manoa majoring in Hawaiian studies and minoring in Business. When [the father] is not in school or studying, he assists community organizations on several community service projects.

. . . .

[Because] "no indebtedness warrants a suspension of the right to be free from compulsory service[,]" [i]mposing a minimum financial requirement on [the father] would be violative of his right to be free from compulsory service. If the stay is not granted and [the father] prevails on appeal, the State would have already violated [the father's] constitutional rights by forcing him to enter the work force in order to meet his support obligations. . . .

Moreover, a stay doesn't impose a hardship on [the mother]. Currently, [the father's] child support obligation for the subject child is *$50.00* per month. Because this amount is nominal the impact on the subject child's standard of living will not be affected. In fact, [the mother] is employed and earns *$502.00* per month. . . .

However, if a stay is not granted and [the father] prevails on appeal, he *will* suffer a great hardship. As noted above, [the mother] and the State would have forced [the father] to enter the work force in order to meet his support obligations to the subject child thereby violating his constitutional right to be free from compulsory service. In addition, forcing [the father] to enter the work force will impede his educational goals and delay his career.

As such, [the father] will suffer unnecessary and irreparable harm.

In an order dated October 8, 2001, we denied the motion and ordered counsel for the father to show cause as to why he should not be sanctioned for filing a frivolous motion.

During the spring of 2003, the mother and father agreed to various settlement terms, contingent upon the dismissal of the instant appeal. Among other things, the father agreed to pay the mother $25,000 upon the adoption of the child by the mother's present husband. On April 16, 2003, the father filed a motion to dismiss the instant appeal. In an affidavit filed with the motion, father's counsel noted, among other things, that "[t]he litigation over the Minor Child has drained both parties financially, emotionally, and psychologically. While the effect on the Minor Child has been difficult to measure, to be sure, it had [sic] not been positive."

The motion to dismiss was supported by the mother but opposed by CSEA, the Plaintiff–Appellee. CSEA noted that its reasons for opposing dismissal included the agency's "strong and vested interest" in resolving a constitutional challenge to the HUPA. In the instant case, in which briefing had been complete for nearly a year when the father filed the motion to dismiss, CSEA asserted that its attorney's fees and costs in defending the appeal exceeded the money due CSEA under the order from which this appeal was taken; if the challenge to the HUPA was not resolved in this appeal, CSEA would be forced to duplicate its efforts in a subsequent case. Further, CSEA asserted that "to dismiss this appeal would be rewarding Mr. Doe for misleading this court and the appellees, by the filing of an apparently frivolous appeal and subjecting both appellees to usage of time and resources without allowing the case to come to its natural conclusion."

In an order dated May 19, 2003, we denied the motion to dismiss.[5]

---

**5.** We note that our decision is not advisory; rather, it pertains to an actual, justiciable controversy. The father did not argue that settlement of related disputes between the defendant-appellant father and defendant-appellee mother would render the instant appeal moot, nor did he subsequently file any evidence regarding payment of the contemplated settlement amount to the mother, successful adoption of the child by the mother's present husband, or payment of the past-due child support and other amounts payable to CSEA under the family court's order. Neverthe-

## II. STANDARD OF REVIEW

■ The constitutionality of a statute is a question of law that we review under the right/wrong standard. *State v. Lee*, 75 Haw. 80, 90, 856 P.2d 1246, 1253 (1993). "[W]e have long held that: (1) legislative enactments are 'presumptively constitutional;' (2) 'a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt;' and (3) the constitutional defect must be 'clear, manifest, and unmistakable.' " *Convention Ctr. Auth. v. Anzai*, 78 Hawai'i 157, 162, 890 P.2d 1197, 1202 (1995) (quoting *Pray v. Judicial Selection Comm'n*, 75 Haw. 333, 340, 861 P.2d 723, 727 (1993) (quoting *Sifagaloa v. Board of Trustees of the Employees' Retirement Sys.*, 74 Haw. 181, 191, 840 P.2d 367, 371 (1992) (quoting *Blair v. Cayetano*, 73 Haw. 536, 542, 836 P.2d 1066, 1069) (brackets in original and citations omitted))). However, this presumption of statutory constitutionality does not apply to laws which classify on the basis of suspect categories or impinge on fundamental rights expressly or impliedly granted by the constitution. *Nelson v. Miwa*, 56 Haw. 601, 605, 546 P.2d 1005, 1008, n. 4 (1976). Such laws are presumed to be *unconstitutional* unless the state shows compelling state interests which justify such classifications, and that the laws are narrowly drawn to avoid unnecessary abridgments of constitutional rights. *Baehr v. Lewin*, 74 Haw. 530, 571–72, 852 P.2d 44, 63–64 (1993). *See also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 60–61, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring).

## III. DISCUSSION

**A. The father did not raise the issue of equal protection at trial or in his pre-hearing legal memorandum; the issue is therefore not preserved for appeal.**

■ The father did not raise the issue of equal protection at trial or in his pre-hearing legal memorandum. An issue which was not raised in the lower court will not be considered on appeal. *Kernan v. Tanaka*, 75 Haw. 1, 35, 856 P.2d 1207, 1224 (1993), *cert. denied*,

510 U.S. 1119, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994).

■ The father argues that he preserved the question of equal protection by stating, in the context of a hearing in which he argued that HUPA violated the father's rights to procreational autonomy and to be free from involuntary servitude, "[f]irst, I'd like to say with respect to the laws and statutes of the State of Hawai'i cited by [counsel for CSEA] we concede that those are the existing statutes, but our argument and position is that they are fundamentally unfair and unconstitutional if you will." This argument is palpably without merit. The father's general assertion is not sufficient to preserve the father's equal protection arguments. Where a litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial or presents a theory that was raised in a vague and ambiguous way, the theory will not be considered. *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721–22 (10th Cir.1993).

> There are sound reasons for the rule. It is unfair to the trial court to reverse on a ground that no one even suggested might be error. It is unfair to the opposing party, who might have met the argument not made below. Finally, it does not comport with the concept of an orderly and efficient method of administration of justice.

*Kawamata Farms v. United Agri Prods.*, 86 Hawai'i 214, 248, 948 P.2d 1055, 1089 (1997) (quoting *Ellis v. State*, 36 Ark.App. 219, 821 S.W.2d 56, 57 (1991)).

Although we have held that we will not hear a question regarding the constitutionality of a statute unless it is raised in the trial court, we have made exceptions in cases where the constitutionality of the statute raised a question of great public import and justice required that we consider the issue. *State v. Ildefonso*, 72 Haw. 573, 584–85, 827 P.2d 648, 655 (1992).

In the instant case, the analysis is similar to the due process analysis this court must perform in conjunction with the procreational autonomy claim, the issues have been fully

---

less, we discuss the motion to dismiss and related circumstances in some detail because they

factor into our analysis with respect to whether the instant appeal was frivolous.

briefed, disposition of the issue may lessen the burden imposed on families, taxpayers, and the courts by future frivolous constitutional challenges to chapter 584, and, though the answer is so obvious as to suggest bad faith on the part of the pleader, the question is of substantial public importance. Consequently, we offer our equal protection analysis in section III.B.2, *infra.*

## B. HUPA does not violate the father's rights to privacy and equal protection.

■ The father argues that HRS chapter 584 is unconstitutional because it violates the father's rights to privacy and equal protection under article I, sections 5[6] and 6[7] of the Hawai'i Constitution and the fourteenth amendment to the United States Constitution[8] by violating the father's right to procreational autonomy and by creating an improper gender-based classification. The father's arguments are manifestly without merit. The father is entitled only to a "rational basis" review of HUPA because: (1) HUPA does not implicate the father's fundamental privacy right to procreational autonomy, but rather his economic interest in not supporting his child; and (2) although the father has standing to raise an equal protection challenge to HUPA, that standing is based on a non-suspect classification, *i.e.,* the biological relationship of fathers to their children. Because HUPA bears a rational relation to the public welfare, the statute survives our rational-basis review, and the father's privacy and equal protection arguments fail.

1. *The father's fundamental right to procreational autonomy does not encompass a right not to support his child.*

The father argues that HUPA violates his right to avoid procreation, which is an ele-

ment of his fundamental right to privacy. However, no state action impaired the father's exercise of his right not to beget a child. Rather, the state, under the authority of HUPA, verified the empirical fact that the father failed to exercise his right not to beget; having verified the father's relationship to the child, the state, acting under authority of HUPA, imposed certain legal obligations resulting from that relationship. Because the father's alleged injury is not to his fundamental right to privacy but rather to his economic interests, he is entitled only to a rational-basis review of HUPA.

■ To state a claim under the fourteenth amendment, a litigant must assert that some state action has deprived the litigant of a constitutionally protected "liberty" or "property" interest. *See, e.g., State v. Guidry,* 105 Hawai'i 222, 227, 96 P.3d 242, 247 (2004); *State v. Bowe,* 77 Hawai'i 51, 59, 881 P.2d 538, 546 (1994). "In determining whether a statute conflicts with the Due Process Clause, we have applied two tests. If a fundamental right is implicated, the statute is subject to strict scrutiny. If, however, a fundamental right is not implicated, the statute is subject to the rational basis test." *State v. Mallan,* 86 Hawai'i 440, 451, 950 P.2d 178, 189 (1998).

■ Under rational-basis review, a statute must "rationally further a legitimate state interest." *Id.* A state interest is "legitimate" if it involves the public health, safety, or welfare. *Mallan,* 86 Hawai'i at 451–52, 950 P.2d at 189–90. In other words, under minimum-rationality due process analysis, a statute must be rationally related to the pub-

---

6. Article I, section 5 of the Hawai'i Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry."

7. Article I, section 6 of the Hawai'i Constitution provides that "[t]he right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The

legislature shall take affirmative steps to implement this right."

8. The fourteenth amendment to the United States Constitution provides in pertinent part:

[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

lic health, safety, or welfare. *Mallan*, 86 Hawai'i at 452, 950 P.2d at 190. In applying the rational-basis test, courts in modern times have given great deference to legislative enactments. *Id.* Statutes are subject to a presumption of constitutionality and the burden of demonstrating that the statute lacks any rational basis lies with the challenger. *Id.*

The father complains that state actions taken under the statutes that permit the establishment of paternity and the imposition and enforcement of child support obligations violated his fundamental constitutional right to avoid procreation. However, he fails to identify any state action that impacted in any way his choice to father a child. He does not argue that the state required him to engage in the sexual activity that resulted in the conception of his child. Nor has he identified any means by which the state interfered in any way with his choice to use or not to use adequate contraceptive methods during sexual activity to avoid his sexual partner's resulting pregnancy.

"While it is true that after conception a woman has more control than a man over the decision whether to bear a child and may unilaterally refuse to obtain an abortion, those facts were known to the father at the time of conception." *Ince v. Bates*, 28 Or. App. 71, 558 P.2d 1253, 1254 (1977)(noting that the choice vests in the woman because she must carry the child and undergo the risks attendant to childbirth or abortion, and holding that a child support obligation could constitutionally be imposed on a father who requested that the mother obtain an abortion or place the child up for adoption)(citing *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)), *cert. denied and appeal dismissed*, 434 U.S. 806 (1977). The father elected a course of conduct inconsistent with the exercise of his right not to beget a child. The reproductive consequences of his actions were imposed by the operation of nature, not statute.

■ Insofar as HUPA does not implicate the father's right to procreational autonomy, the sole "liberty" or "property" interest at issue implicating state action is his *de minimis* child support obligation. A "putative father has no legitimate right and certainly no liberty interest in avoiding financial obligations to his natural child that are validly imposed by state law." *Rivera v. Minnich*, 483 U.S. 574, 580, 107 S.Ct. 3001, 97 L.Ed.2d 473 (1987). In other words, HUPA does not implicate the father's fundamental rights, but rather the father's economic interest. Where economic interests are concerned, the rational-basis test is the proper standard. *Maeda v. Amemiya*, 60 Haw. 662, 669, 594 P.2d 136, 141 (1979).

2. *The father's only tenable equal protection challenge to chapter 584 is based on a nonsuspect classification, i.e. the biological relationship of fathers to their children.*

■ The father argues that HUPA deprives him of his right to equal protection by creating an improper gender-based classification.[9] The father cites some language from chapter 584 in support of his argument, but when the chapter is read as a whole, it is clear that the cited language statute makes no improper distinction between men and women. To the extent that the father receives disparate treatment under the statute, it is on the basis of his relationship to his child; legal classifications based on the biological relationship of fathers to their children are not subject to an elevated level of scrutiny.

As we explained in *State v. Miller*:

The guarantee of equal protection of the laws under Hawai'i and United States Constitutions requires that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. However, equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.

*Miller*, 84 Hawai'i 269, 276, 933 P.2d 606, 613 (1997)(internal citations and quotation marks omitted).

**9.** As noted above, this argument is deemed to be waived.

"Whenever a denial of equal protection of the laws is alleged, as a rule our initial inquiry has been whether the legislation in question should be subjected to 'strict scrutiny' or to a 'rational basis' test." *Baehr v. Lewin*, 74 Haw. 530, 571, 852 P.2d 44, 63 (1993) (quotations and citations omitted). We have applied strict-scrutiny analysis to laws classifying on the basis of suspect categories or impinging upon fundamental rights expressly or impliedly granted by the constitution, in which case the laws are presumed to be unconstitutional unless the state shows compelling state interests which justify such classifications, and that the laws are narrowly drawn to avoid unnecessary abridgments of constitutional rights. *Baehr*, 74 Haw. at 571–72, 852 P.2d at 63–64 (internal citations and quotation marks omitted).

By contrast, where suspect classifications or fundamental rights are not at issue, this court has traditionally employed the rational-basis test. *Baehr*, 74 Haw. at 572, 852 P.2d at 64 ("Under the rational basis test, we inquire as to whether a statute rationally furthers a legitimate state interest. Our inquiry seeks only to determine whether any reasonable justification can be found for the legislative enactment." (Citations and quotation marks omitted.))

HRS chapter 584, Hawai'i's Uniform Parentage Act, provides for a variety of procedures relating to the establishment of the parent-child relationship and the enforcement of duties resulting from that relationship. Chapter 584 applies to both mothers and fathers but recognizes that different procedures may be required to establish fatherhood than are required to establish motherhood.[10] Certain sections of Chapter 584 differentiate between mothers and fa-

thers. To the extent that these differences are related to fundamental differences in the way fathers and mothers are situated with respect to proof of parenthood, it is beyond doubt that these sections pass constitutional muster. As the United States Supreme Court observed in *Tuan Anh Nguyen v. I.N.S.*:

"In the case of the mother, the relation is verifiable from the birth itself. The mother's status is documented in most instances by the birth certificate or hospital records and the witnesses who attest to her having given birth.

In the case of the father, the uncontestable fact is that he need not be present at the birth. If he is present, furthermore, that circumstance is not incontrovertible proof of fatherhood. Fathers and mothers are not similarly situated with regard to the proof of biological parenthood. The imposition of a different set of rules for making that legal determination with respect to fathers and mothers is neither surprising nor troublesome from a constitutional perspective."

*Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 62–63, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001) (rejecting an equal protection challenge to a statute providing different procedures for establishing a father-child relationship than for the mother-child relationship); *see also Miller v. Albright*, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (same).

However, the father directs our attention to various clauses in § 584–15(c) and (d) that specifically pertain to fathers, yet bear no apparent relationship to any biological difference between mothers and fathers.[11]

---

**10.** HRS § 584–3, in its entirety, reads:

How parent and child relationship established. The parent and child relationship between a child and:
(1) The natural mother may be established by proof of her having given birth to the child, or under this chapter;
(2) The natural father may be established under this chapter;
(3) An adoptive parent may be established by proof of adoption.

**11.** HRS § 584–15 provides in relevant part:
§ 584–15 Judgment or order.

. . . .

(c) The judgment or order may contain any other provision directed against the appropriate party to the proceeding, concerning the duty of support, the custody and guardianship of the child, visitation privileges with the child, the furnishing of bond or other security for the payment of the judgment, or any other matter in the best interest of the child. Upon neglect or refusal to give this security, or upon default of *the father or the father's surety* in compliance with the terms of the judgment, the court may order the forfeiture of any such security . . . and may also sequester *the father's* personal

The cited language, if read in isolation from the remainder of chapter 584, suggests a gender-based classification; classifications on the basis of gender are suspect, and therefore subject to strict scrutiny. *Baehr,* 74 Haw. at 580, 852 P.2d at 67.

■■■ We may not read statutory language out of context. As this court explained in *State v. Savitz:*

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

97 Hawai'i 440, 443, 39 P.3d 567, 570 (2002).

HRS § 584–15 is one of a series of sections (§ 584–6 through § 584–20) that provide procedures to be followed in an action to determine the father and child relationship. The section immediately following this series, § 584–21, titled "Action to declare mother and child relationship," provides that: "Any interested party may bring an action to determine the existence or nonexistence of a mother and child relationship. Insofar as practicable, the provisions of this chapter applicable to the father and child relationship shall apply."

When thus understood in the context of the broader statutory scheme, the language cited by the father does not create an improper gender-based classification. Rather, the legislature has ensured that mothers will be subject to the same enforcement procedures and statutory privileges applied to fathers. The equal protection clause requires no more than that "[i]nsofar as practicable, the provisions . . . applicable to" a man apply when the same kind of action is brought against a woman.

To the extent that the father has alleged an equal protection injury, it flows not from any gender-based distinction, but rather from the statute's classification of parties as fathers based on their biological relationship to their children.[12] Insofar as "[c]ourts have *never* found that legal classifications based on [the] biological relationship of fathers and their children were subject to a high level of scrutiny," *N.E. v. Hedges,* 391 F.3d 832, 835 (6th Cir.2004)(citing *Parham v. Hughes,* 441 U.S. 347, 355–57, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979)), *cert. denied,* —— U.S. ——, 126 S.Ct. 480 (2005) (emphasis added), our equal protection inquiry seeks only to determine whether any reasonable justification can be found for chapter 584.

3. *Chapter 584 rationally furthers a legitimate state interest.*

■■■ We have described the task faced by a litigant whose claim is subject to a rational-basis review:

> Under this [rational-basis] standard, to prevail, a party challenging the constitutionality of a statutory classification on equal protection grounds has the burden of showing, with convincing clarity that the

---

estate, and the rents and profits of *the father's* real estate, and may appoint a receiver thereof, and may cause *the father's* personal estate, including any salaries, wages, commissions, or other moneys owed to *him* and the rents and profits of *his* real estate, to be applied toward the meeting of the terms of the judgment, to the extent that the court, from time to time, deems just and reasonable. . . .

(d) Support judgment or orders ordinarily shall be for periodic payments which may vary in amount. . . . The court may limit *the father's* liability for past support of the child to the proportion of the expenses already incurred that the court deems just.

**12.** As the United States Court of Appeals for the Sixth Circuit noted in *N.E. v. Hedges,* in which the court addressed similar procreational autonomy and equal protection arguments:

[T]here are no judicial decisions recognizing a constitutional right of a man to terminate his duties of support under state law for a child that he has fathered, no matter how removed he may be emotionally from the child. Child support has long been a tax fathers have had to pay in Western civilization. For reasons of child welfare and social utility, if not for moral reasons, the biological relationship between a father and his offspring—even if unwanted and unacknowledged—remains constitutionally sufficient to support paternity tests and child support requirements. . . . Reproduction and child support requirements occur without regard to the male's wishes or his emotional attachment to his offspring.

391 F.3d 832, 836 (2004) (internal citations omitted).

classification is not rationally related to the statutory purpose, or that the challenged classification does not rest upon some ground of difference having a fair and substantial relation to the object of the legislation, and is therefore not arbitrary and capricious.

*Sandy Beach Defense Fund v. City Council,* 70 Haw. 361, 380, 773 P.2d 250, 262 (1989) (citations omitted). The father concedes that "Hawai'i certainly has an interest in protecting the welfare of a minor and the conservation of the State's public assistance fund." The father has not demonstrated that HUPA's classification of parties as fathers bears no rational relationship to this objective or to some other legitimate state interest. Rather, it is beyond doubt that child support laws, imposed by all fifty states and supported by a variety of federal enactments, are rationally related to the public welfare and that the imposition of support obligations on fathers rather than non-fathers is not arbitrary or capricious. Our due process and equal protection inquiries are therefore concluded. Chapter 584 is constitutional.

### C. The family court did not violate the father's right to be free from compulsory service.

■■■■■ The father argues that the family court violated the father's fundamental right to be free from compulsory service when it ordered him to pay monthly child support for the subject child. In other words, he argues that the statute violates the prohibition against slavery or the prohibition against peonage. Specifically, the father argues that "the Family Court does not have the authori-

ty to force a natural father to interrupt his educational pursuits to obtain employment in order to satisfy monetary obligations imposed on him without his consent." [13] The father's arguments are so palpably lacking in merit as to suggest bad faith on the part of the pleader. The court may, without running afoul of either the thirteenth amendment or the prohibition against imprisonment for failure to pay a debt, *imprison* a party for failure to pay child support. *See, e.g., United States v. Ballek,* 170 F.3d 871 (9th. Cir.1999), *cert. denied,* 528 U.S. 853, 120 S.Ct. 318 (1999). *Ipso facto,* it is certainly within the court's power to impose the *de minimis* support obligations at issue in this case, despite the father's preference not to pay.

The thirteenth amendment abolished slavery and involuntary servitude, except as punishment for a crime, and gave congress the authority to enforce the amendment by appropriate legislation. [14] The Antipeonage Act of 1867, 42 United States Code (USC) § 1994, was enacted under this authority. [15] Under some circumstances, the amendment and the aforementioned act prohibit imprisonment for failure to pay a debt. *See, e.g., Pollock v. Williams,* 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944).

In *Ballek,* the Ninth Circuit addressed a thirteenth amendment challenge to the Child Support Recovery Act, noting that not all forced employment is constitutionally prohibited and concluding that enforcement of child-support awards, which had been enforced by imprisonment prior to the adoption of the thirteenth amendment, is constitutionally permissible. [16] 170 F.3d at 871, 874.

---

**13.** In the instant case, the obligation alleged to be the moral equivalent of human bondage amounts to $50 per month.

**14.** The thirteenth amendment to the United States Constitution reads, in its entirety:

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
Section 2. Congress shall have power to enforce this article by appropriate legislation.

**15.** 42 USC § 1994 reads, in its entirety:
The holding of any person to service or labor under the system known as peonage is abol-

ished and forever prohibited in any Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of any Territory or State, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void.

**16.** The *Ballek* court offered further analysis:

We conclude that child-support awards fall within that narrow class of obligations that may be enforced by means of imprisonment

This analysis is in accord with that of the California Supreme Court. *See Moss v. Superior Court*, 17 Cal.4th 396, 71 Cal.Rptr.2d 215, 950 P.2d 59 (1998).

In *Moss*, the court noted that "[t]he obligation of a parent to support a child ... is among the most fundamental obligations recognized by modern society"[17] and "to become employed if that is necessary to meet the obligation, is in no way comparable or akin to peonage or slavery." *Id.* 71 Cal. Rptr.2d at 223, 950 P.2d at 67. The court distinguished the child support obligation from involuntary servitude on the grounds that the obligee is free to choose his employment and employer:

> When, as here, however, the person claiming involuntary servitude is simply expected to seek and accept employment, if available, and is free to choose the type of employment and the employer, and is also free to resign that employment if the conditions are unsatisfactory or to accept

other employment, none of the aspects of "involuntary servitude" which invoke the need to apply a contextual approach to Thirteenth Amendment analysis are present. There is no "servitude" since the worker is not bound to any particular employer and has no restrictions on his freedom other than the need to comply with a lawful order to support a child. Working to earn money to support a child is not involuntary servitude any more than working in order to pay taxes. Failure to do either may subject one to civil and criminal penalties, but that compulsion or incentive to labor does not create a condition of involuntary servitude.

*Id.* 71 Cal.Rptr.2d at 228, 950 P.2d at 72. The court held that the obligation to comply with a child support order and to work if necessary to do so does not constitute involuntary servitude. *Moss*, 71 Cal.Rptr.2d at 229, 950 P.2d at 73.

without violating the constitutional prohibition against slavery. We start with the self-evident observation that the relationship between parent and child is much more than the ordinary relationship between debtor and creditor. The parent is responsible for bringing the child into the world and in so doing assumes a moral obligation to provide the child with the necessities of life, and to ensure the child's welfare until it is emancipated and able to provide for itself. When parents neglect their children, this raises more than a private legal dispute. It is a matter of vital importance to the community, and every state now enforces, by means of criminal sanctions, the parent's obligation to support children within his custody. ... Experience teaches that the natural bonds, which normally ensure that children are cared for, are sometimes weakened when the affinity between the parents comes to an end. The supervision—and coercive power— of the court is often invoked to prompt the non-custodial parent to continue providing support. The non-custodial parent's obligation to pay child support is thus derivative of the obligation to provide support in a custodial setting, and such awards are routinely enforced by imprisonment. The state also has an interest in protecting the public fisc by ensuring that the children not become wards of the state. *Cf. Butler[v. Perry]*, 240 U.S. [328,] 333, 36 S.Ct. 258, 60 L.Ed. 672 [ (1916) ] ("[The Thirteenth Amendment] certainly was not intended to interdict enforcement of ... duties which individuals owe to the State....") At least one state Supreme Court has rejected the argument that imprisonment for failure to work in order to earn enough money to make

child support payments violates state and federal prohibitions against slavery. See *Moss v. Superior Court*, 17 Cal.4th 396, 71 Cal.Rptr.2d 215, 222, 950 P.2d 59, 66 (1998).

Were we to hold ... that enforcing child support obligations by threat of imprisonment violates the Thirteenth Amendment, we would undermine the well-established practices in the state courts for policing compliance with child support obligations. We would, effectively, put children on the same footing as unsecured creditors. We decline to interpret the Thirteenth Amendment in a way that would so drastically interfere with one of the most important and sensitive exercises of the police power—ensuring that persons too young to take care of themselves can count on both their parents for material support.

*Ballek*, 170 F.3d at 874–75 (some citations omitted).

17. In a footnote, the court emphasized the overarching nature of the obligation:

The state's interest in and public policy mandating parental support of children is so strong that jurisdictions faced with the question hold that it extends even to juvenile fathers who were the victims of statutory rape by adult women. *See State ex rel. Hermesmann v. Seyer*, 252 Kan. 646, 847 P.2d 1273 (1993); *In re J.S.*, 193 Ill.App.3d 563, 140 Ill.Dec. 621, 550 N.E.2d 257 (1990); *Com. v. A Juvenile*, 387 Mass. 678, 442 N.E.2d 1155 (Mass.1982); *In re Paternity of J.L.H.*, 149 Wis.2d 349, 441 N.W.2d 273 (1989).

*Moss*, 71 Cal.Rptr.2d 215, 950 P.2d at 67, n. 8.

Other courts that have addressed thirteenth amendment challenges to court-imposed family support obligations have reached the same conclusion. *See, e.g., McKenna v. Steen,* 422 So.2d 615 (La.App.1982)(allegations that child support order imposed on a law student amounted to an imposition of involuntary servitude by forcing him to continue in his previous occupation "so ludicrous that they hardly dignify a response"); *Hicks v. Hicks,* 387 So.2d 207 (Ala.Civ.App.1980)(holding that an alimony order does not impose involuntary servitude); and *Freeman v. Freeman,* 397 A.2d 554 (D.C.1979)(party's contention that child support order directing him to seek gainful employment violated thirteenth amendment held to be without merit). In light of the unanimous weight of well-settled precedent contrary to the father's contention, we conclude that the father has not demonstrated beyond a reasonable doubt that HUPA suffers from a clear, manifest, and unmistakable constitutional defect. The family court did not violate the father's right to be free from involuntary servitude by ordering him to pay $50 per month to support his child, despite the father's preference to remain unemployed.

Insofar as the father has not demonstrated beyond a reasonable doubt that HUPA is unconstitutional, and insofar as the father's rights to privacy, equal protection, and involuntary servitude have not been violated, we affirm the family court's order, findings of fact, and conclusions of law.

## C. The appeal is entirely frivolous.

Pursuant to HRAP Rule 38 (2004), "[i]f a Hawai'i appellate court determines that an appeal decided by it was frivolous, it may, after a separately filed motion or notice from the appellate court and reasonable opportunity to respond, award damages, including reasonable attorneys' fees and costs, to the appellee." This court has explained that:

[u]nder HRAP Rule 38, the court may award sanctions in one of two ways. The court can, sua sponte, determine an appeal to be frivolous; give notice to the parties and allow them the opportunity to respond; and if the court decides is appropriate, award sanctions. Alternatively, a party may move for sanctions by way of a separately filed motion, giving the opposing side the opportunity to respond. The court, upon reviewing the arguments of the parties, can then decide the issue of frivolousness and award sanctions accordingly.

*Rhoads v. Okamura,* 98 Hawai'i 407, 413, 49 P.3d 373, 379 (2002).

In *Rhoads,* we articulated the standard by which we determine whether an appeal is frivolous:

For an assignment of error to be frivolous it must be manifestly and palpably without merit. This court has defined a frivolous claim as one so manifestly and palpably without merit as to indicate bad faith on the pleader's part such that argument to the court was not required. HRAP Rule 38 sanctions have been imposed in past cases where the appellant has engaged in a pattern of frivolous and vexatious litigation or where appellant has continued to acknowledge controlling authority contrary to her assertions.

*Rhoads,* 98 Hawai'i at 414, 49 P.3d at 380 (citations, quotation marks, and ellipsis omitted). In determining whether an appeal is frivolous, this court may consider whether other state courts have determined similar claims to be frivolous. *See Rhoads,* 98 Hawai'i at 415, 49 P.3d at 381. This court may also look to the federal courts' application of their equivalent Rule 38 for guidance. *See Rhoads,* 98 Hawai'i at 414, 49 P.3d at 380.

The father argued that HUPA is unconstitutional because *it violates his rights to privacy, equal protection, and his right to be free from compulsory service.* Each of these contentions has been demonstrated to be palpably without merit and long ago put to rest by well-settled precedent. Furthermore, each of these contentions has been determined to be frivolous or manifestly without merit by other courts. *See, e.g., Hedges,* 391 F.3d at 836[18] (upholding an

---

18. In an equal protection and 'procreational autonomy' challenge to a child support order, the

Sixth Circuit upheld an award of fees for frivolous action:

award of attorney's fees for frivolous 'pro-creational autonomy' and equal protection challenge to child support order); *Steen*, 422 So.2d at 618 (allegation that child support order amounts to involuntary servitude "so ludicrous that [it] hardly dignif[ies] a response"); *Knight v. Mercer Island*, 70 Fed. Appx. 413, 415, 2003 WL 21480340 (9th. Cir. 2003) (unpublished; on appeal from an unsuccessful involuntary servitude challenge to a child support order, affirming the district court's entry of a litigation bar preventing appellant from filing any further frivolous filings); *Freeman*, 397 A.2d at 557 (involuntary servitude challenge to child support order so lacking in merit as to be addressed in a conclusory fashion in a footnote). The father also attempted to advance arguments on appeal that were not raised in the trial court, without providing any nonfrivolous basis as to why this court should nevertheless consider them.

This court is not obliged to "suffer in silence the filing of baseless, insupportable appeals presenting no colorable claims of error and designed only to delay, obstruct, or incapacitate the operations of the courts or any other governmental authority.... The government should not have been put to the trouble of responding to such spurious arguments, nor this court to the trouble of 'adjudicating' this meritless appeal." *Rhoads*, 98 Hawai'i at 414, 49 P.3d at 380 (quoting *Crain v. C.I.R.*, 737 F.2d 1417, 1418 (5th Cir.1984)). The father's arguments are "manifestly and palpably without merit" and thus his appeal is "frivolous" in the context of HRAP 38.

This court has articulated the policies behind awarding attorney's fees:

> Awards of attorneys' fees induce people to reconsider and ensure that refusals to surrender do not burden the innocent. They also protect the courts—and derivatively parties in other cases—from impositions

on their time.... The court has an interest in the orderly conduct of business, an interest independent of the [opposing party]....

*Rhoads*, 98 Hawai'i at 414, 49 P.3d at 380 (quoting *Abastillas v. Kekona*, 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (citation omitted)). The allegedly penurious father, unable to afford $50 per month to support his child, commanded his attorney to doggedly pursue an appeal with no chance of success, file numerous pointless motions, and force the state to expend large amounts of taxpayers' money to defend the child support regime from meritless attacks. An award of fees as provided for by HRAP Rule 38 may be justified in this case.

## IV. CONCLUSION

For the foregoing reasons, we affirm the family court's order, findings of fact, and conclusions of law. We hereby give notice to the parties that the appeal was frivolous and request briefing with regard to damages and costs to be awarded to CSEA as authorized by HRAP Rule 38. Briefs by appellees shall be submitted within 15 days of the date of this opinion and appellant's responses thereto shall be submitted within 15 days thereafter.

---

The plaintiff presents simply a novel legal theory, a theory that would invalidate the paternity and child support laws of the fifty states and the federal acts on child support. The theory is that unwed fathers, as a matter of reciprocity, should also be given the choice to deny any financial responsibility for the child's existence. It is a theory so foreign to our legal tradition that it has no "foundation," no chance of success. We cannot imagine that any federal court would agree with plaintiff's principle that the concept of "procreative privacy" should be stretched to include the constitutional right for a father to receive the constitutional equivalent of the termination of the mother's pregnancy by allowing him the right to deny paternity and deny the duty of financial support.

*Hedges*, 391 F.3d at 836.